Diana L. Fitzgerald, Esq. (California Bar No. 170405)
Diana@filawyers.com
FITZGERALD & ISAACSON, LLP
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, CA 90212
Telephone:   (310) 480-0090
Facsimile:    (310) 402-0306

Nima Tahmassebi, Esq. (Florida Bar No. 121690)
ntahmassebi@pbyalaw.com
Benjamin Reiss, Esq. (Florida Bar No. 985643)
breiss@pbyalaw.com
PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
283 Catalonia Avenue, Suite 200
Coral Gables, FL 33134
Telephone:   (305) 377-0086
Facsimile:    (305) 377-0781

*Attorneys for Plaintiffs LCC Enterprises LLC and Daniel Cohen*

## IN THE UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LCC ENTERPRISES LLC, a Delaware limited liability company, and DANIEL COHEN, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> ROMAN CRESTO, an individual, JOHN CRESTO, an individual, and STRYDER HOLDINGS LLC, a California limited liability company, <br><br> Defendants. | Case No.  **'22 CV 1944 DMS BGS** <br><br> **COMPLAINT FOR DAMAGES:** <br><br> 1) FRAUD IN THE INDUCEMENT; <br> 2) NEGLIGENT MISREPRESENTATION; <br> 3) BREACH OF CONTRACT; <br> 4) DEFAMATION; AND <br> 5) VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.* <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs, LCC Enterprises LLC and Daniel Cohen, by and through undersigned counsel, hereby sue Defendants, Roman Cresto, John Cresto and Stryder Holdings LLC, and allege:

## **INTRODUCTION**

1.      Defendants Roman Cresto and John Cresto (the "Crestos") took advantage of hundreds of small business owners through an entity they formed called Empire Ecommerce LLC (the "Company" or "Empire"), by enticing them into paying considerable monies for purported business opportunities upon which they never delivered. The Crestos claimed they could provide the "easiest way to build, scale, and run your Amazon, Facebook or Walmart marketplace e-commerce store," to generate passive income—as one purported client testimonial claimed, "the ability to make money while I sleep."  Lured by the promise of "passive income", hundreds of small business owners paid the Crestos for their service, but soon discovered the Crestos had no intention of delivering on their word.  Facing mounting complaints coupled with actual and threatened litigation, the Crestos took the first opportunity to exit the Company, absconding with their customers' money in the process.  When they did so, they left in their wake a trail of former customers who feel nothing short of cheated and with cumulative losses totaling in the millions.

2.      As part of their exit strategy, the Crestos targeted Daniel Cohen in an attempt to dump legal liabilities, customer complaints, and losses on him.  Making

numerous misrepresentations and omissions concerning the financial status of the Company, its customer base, and its legal troubles and potential liabilities, the Crestos duped Mr. Cohen into purchasing the Company.  Shortly after the ink was dry on the purchase agreement, the Crestos disclosed a file of legal liability that led Mr. Cohen to discover the Company was rife with numerous liabilities, active lawsuits, and issues that exposed the Company and Mr. Cohen to significant  losses.  When Mr. Cohen demanded rescission of the purchase agreement of the Company, the Crestos refused to admit their lies and cover-ups.  Instead, the Crestos escalated their unlawful activities by defaming Mr. Cohen to hundreds of the Company customers and others in an effort to deflect from their own fraud scheme and breaches.  As a  result, Plaintiffs bring this lawsuit to seek justice and bring an end to the Crestos' wrongful conduct.

## **THE PARTIES**

3.     At all times herein mentioned, Plaintiff LCC Enterprises LLC ("LCC") was and is a Delaware limited liability company that maintains its principal place of business in the County of Broward, State of Florida.  LCC carries out its core executive and administrative functions in the State of Florida.

4.     At all times herein mentioned, Plaintiff Daniel Cohen ("Daniel") was and is a citizen of the State of Florida, who conducts business within the State of Florida, and resides in the State of Florida.  Daniel is the sole member of LCC.

5.     Upon information and belief, Defendant Roman Cresto ("Roman") is an

individual residing in the County of San Diego, State of California and conducts business within the State of California.

6. Upon information and belief, Defendant John Cresto ("John") is an individual residing in the County of San Diego, State of California and conducts business within the State of California.

7. Upon information and belief, at all times herein mentioned, Defendant Stryder Holdings, LLC ("Stryder") was and is a California limited liability company that maintains or has maintained a principal place of business in San Diego County, California, and conducts business within the State of California. Stryder was the sole owner of Empire until it was sold to LCC pursuant to the Agreement. The Crestos wholly own Stryder.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this matter and Defendants because Defendants are located in the County of San Diego, State of California, and expressly consented to the exclusive jurisdiction of state or federal court in the County of San Diego, State of California pursuant to the subject agreement in this action. Further, this Court has personal jurisdiction over Defendants as they reside in this jurisdiction, and committed acts giving rise to the claims against them in this jurisdiction.

9. This Court has subject matter diversity jurisdiction over this action under 28 U.S.C. § 1332, as the amount in controversy exceeds the sum of $75,000, exclusive

of interest and costs, and there is complete diversity of citizenship between and among the parties.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because the material actions or omissions which give rise to this suit occurred in this judicial district, a substantial part of the events causing injury and establishing the claims occurred in this judicial district, and Defendants expressly consented to such venue in the Agreement.

## GENERAL ALLEGATIONS

### I.      THE DECEPTIVE SCHEME DEFRAUDING PLAINTIFFS

11.     Defendant Stryder, which is a holding company wholly owned by the Crestos, was the single member in Empire Ecommece LLC (the "Company" or "Empire") until Empire was sold to Daniel.

12.     Through Empire, Defendants offered customers to build, scale, and run their customers' e-commerce stores.

13.     Defendants operated Empire under a three-step process.  In step 1, Empire acquired or built out the client's ecommerce store.  In step 2, Empire "auto-scaled" the store by populating it with "the right products at the right time for sale" to Amazon, Facebook, or Walmart customers.  In step 3, Empire would "auto-run" the client's ecommerce store by purchasing items sold from Empire's suppliers at a cheaper price than the customer paid in the client's ecommerce store, thereby generating a profit.

14.     Using the promise of expertly managing their clients' ecommerce stores to generate passive income for their clients, Defendants used Empire to lure hundreds of small businesses to sign up and pay considerable monies to set up and manage their ecommerce stores.

15.     However, Defendants failed to live up to their promises, resulting in numerous client complaints, threatened, and actual legal action against Empire.  In view of mounting public exposure and legal liability, Defendants sought a way to divest themselves of Empire through a sale to an unwitting victim of the Crestos' fraud.

16.     On October 26, 2022, Roman Cresto contacted Daniel and proposed that Daniel acquire the Defendants' interest in the Empire.

17.     To induce Daniel into entering into the agreement to purchase Empire, Roman showed Daniel financials and projections through a share file, and represented to Daniel that purchasing Empire would "[g]enerate passive income of 12-25% monthly profit splits" that Daniel would be able to get "35-50% of profit" recurring monthly from Empire's customers (the "Projections"), and that the Company was financially strong.

18.     Daniel, who had no prior dealings with the Crestos and no knowledge of the fraud he would later uncover, performed due diligence and asked the Crestos about Empire's liabilities and overall legal exposure.  During an October 29, 2022 Zoom conference between the Crestos and Daniel, the Crestos made the following

representations: (i) John represented that Empire's clients primarily consisted of "family and friends"; (ii) John represented that Empire was not facing any "lawsuits" or "liabilities" (Roman then agreed with John on this point); and (iii) Roman represented that although "a couple clients" had requested refunds in connection with their suspended Amazon stores, he and John were confident they could "smooth things over" by staying on an extra month after the sale agreement was executed to assist with transitioning the existing company clients over to new ownership.

19.     The purchase agreement for the Company also contained specific representations made by the Crestos.  Relying upon the Crestos' representations, the Projections and financials, Plaintiffs agreed to purchase Empire.

20.     On November 7, 2022, Roman and John, on behalf of Stryder (collectively, "Sellers"), and Daniel, on behalf of LCC (collectively, "Buyer"), executed the Membership Interest Purchase Agreement (the "Agreement") for the purchase of Empire.  A copy of the Agreement is attached hereto as **Exhibit A**.

21.     In Section 2.5 of the Agreement, Sellers represented that "[t]he Company has no liabilities or indebtedness of any kind, accrued or unaccrued."

22.     In Section 2.6 of the Agreement, Sellers represented that:

[t]here is no legal proceeding . . . litigation, suit, or other proceeding (whether civil, criminal, administrative, judicial, or investigative, whether formal or informal, whether public or private) commenced or brought by any person or entity, or conducted or heard by or before, or otherwise involving, any court or . . . any arbitrator or arbitration panel ("***Action***") of

-7-
COMPLAINT FOR DAMAGES

any nature pending or threatened by or, to Seller's knowledge, against Seller or the Company . . ..

*Id.* (emphasis in original).

23.     Section 2.6 of the Agreement also provides that "[t]o Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action." *Id.* Finally, as to the meaning behind the terms "Seller's knowledge", "knowledge of Seller", and any similar phrases, the Agreement provides that those terms "shall mean ***the actual knowledge of Roman Cresto after reasonable inquiry***." *Id.* (emphasis added).

24.     In reliance on the documentation and representations stated herein, Buyer agreed to purchase the Company and wired the purchase price of $100,000.00 (the "Purchase Price") to Sellers.

## II.     THE CURTAIN OF DEFENDANTS' DECEPTION IS UNVEILED

25.     Two days after the Agreement was executed, on November 9, 2022, Buyer and Sellers participated in a Zoom integration call ("Integration Call").  Toward the end of the Integration Call, the Crestos advised Daniel they wanted to share a file with him on some open matters.  Via Dropbox, Roman then shared with Daniel a folder entitled "Dan Cohen Integration Folder", which contained a memorandum titled "Stubbs Alderton & Markiles, LLP's Open Matters for Empire Ecommerce LLC" (the "Open Matters").

26.     While still on the call, Daniel reviewed the Open Matters.  During his review, Daniel first learned Empire was actively involved in five different open legal matters, including (i) a legal dispute with an Empire client alleging breach of contract and fraud against Empire; (ii) a legal dispute with an Empire client claiming breach of contract and fraud in the inducement against Empire and another company; (iii) a legal dispute with an Empire client who alleged that Empire grossly mismanaged her Walmart and Amazon stores in violation of the Dropshipping Service Agreement and fraudulently misrepresented Empire's ability to operate e-commerce stores on Walmart's and Amazon's platforms; (iv) a currently suspended arbitration initiated by Empire against one of its former clients; and (v) an active bankruptcy proceeding related to the same former client.

27.     Perplexed by what he was reading, Daniel stated that he was never told about this prior to or at the time he purchased the Company and that this was not what Sellers represented to him.  In response, the Crestos said that the matters were not lawsuits, and that they would set up a call with the Company's lawyers to confirm what they were saying to Daniel.

28.     Shortly after this, Buyer also learned of other client issues and complaints. This first occurred on November 11, 2022, when Buyer and Sellers together began contacting Empire's clients to inform them of the new ownership change.  As if that was not enough, after Buyer sent an introductory email introducing new management

to each of Empire's customers, he was flooded with angry customers, some threatening, concerned about the state of their online stores, and a substantial majority of them reporting waiting six to eight months for stores that were never delivered. Some customers had paid between $65,000 to $100,000 for "aged stores"[1] that they never received. One client reported paying as much as $500,000 for his four stores, and said he and his father had been "scammed." Many clients complained they were unable to get a response from anyone at Empire for weeks until speaking with Buyer for the first time.

29.    Subsequently, Buyer searched the support line email address (info@empirecomm.com) inbox, which he received after he purchased the Company, using the search terms, "fraud", "scam", "lawsuit", "lawyer", "refund". Multiple emails matched the search terms. The inbox was riddled with an overwhelming number of customer complaints.

30.    Since acquiring Empire, the types of complaints that Daniel personally received and discovered in Empire's support line inbox include, but are not limited to,

---

[1] An "aged store" is a store that already has a record history (i.e., sales history, customer reviews, trust with Amazon, etc.) in comparison to a new online store. Aged stores are advertised as turn-key operations that can produce more profitable returns to customers (so long as customers make larger capital contributions) within a shorter period of time.

the following:

a.     "Yes, I paid Roman 490k total for 6 stores . . . between LLC set-ups/fees, credit card feeding, virtual store fees, their software on several that they told me would push my stores to the top, etc, etc, they scammed me for well over $525k total.";

b.     "I purchased two stores from Empire E-Commerce in July 2022. Unfortunately, your company has failed to perform and provide transfer of ownership in a timely manner . . . I would like to request a refund for my initial investment of $120,000 immediately.";

c.     "I paid you guys $65k for a experienced store. Since starting my store has done no where near the projections. Now my store has stopped having any sales at all. I need to know why this is and what happened. I am starting to feel like I was scammed and I need to get my lawyer involved.";

d.     "On a $45,000 investment you have yet to return a single dollar in profit and have apparently stopped working on the store."

e.     "So to summarize, I'm down over $43,000 in a year and that doesn't even include all of my LLC setup costs and other monthly expenses that were asked of me over the past year."

f.     "I have been waiting almost 2 years for the $25k I am owed from this store and it is truly getting out of hand now, especially learning about a

different email associated to my store.";

g.     "I entered my 10th, 11th, 12th month with 0 ROI and an Amazon store that was suspended due to shady dropshipping business practices not fully explained to clients.";

h.     "My store was shut down and amazon confiscated 60k that I still owe to credit cards.";

i.     "My store has never operate[d] the way it's supposed to according to the contract."; and

j.     "I trusted Empire with my Credit card info and accounts to safe guard this information, and clearly there is fraud being conducted and I am the victim here."

31.     Ultimately, Buyer was stunned by the shop of horrors encountered while on customer calls, and in reviewing customer emails that were the direct result of Defendants' fraudulent conduct.

## III.   DEFENDANTS' DEFLECT THEIR FRAUD BY DEFAMING DANIEL AND INTERFERING WITH BUSINESS RELATIONSHIPS

32.     On November 23, 2022, Buyer confronted Sellers regarding their fraud. Daniel called Roman and advised him that the clients of the Company the Crestos sold to him never got what they paid for, and that the Crestos misrepresented the financial status, and legal issues and liability exposure of the Company.  Roman abruptly ended

the call and said he would call Daniel back.  Later, John called Daniel.  Daniel repeated his statements concerning the legal issues and viability of the Company to John, and stated that the Crestos used Daniel as a pawn to get out from under the fraud they perpetuated on the Company's clients.  Daniel demanded the Agreement be rescinded, and John indicated he would get back to him.

33.     In response to Daniel's demand, Roman e-mailed Daniel that same day and said "[I]t seems like you are overwhelmed because your company has doubled in size and you want to talk to every single client personally. Again, you likely need to hire new team members to handle your now larger company, as we've suggested many times." A copy of Roman Cresto's e-mail to Daniel Cohen dated November 23, 2022 is attached hereto as **Exhibit B**.

34.     The Crestos also removed Daniel's access to the share file that contained the Company's financials and the Projections.

35.     Ignoring Daniel's demand for recission of the Agreement due to their fraud, on November 25, 2022, Roman Cresto uploaded a two-slide post to his Instagram account, @romancresto, titled "Dropshipping Direct Announces Its Acquisition of Empire Ecommerce" (the "Post"). The Post begins with a header from Bloomberg's mobile website, which suggests that the subject article within the Post originated from

Bloomberg.com.[2] Below the Bloomberg header is the title "Dropshipping Direct Announces Its Acquisition of Empire Ecommerce" along with the date and time of the publication, November 15, 2022 at 11:45 AM PST.

36.   The representation that Dropshipping Direct acquired Empire is false. Roman Cresto is aware that the Agreement is only between LCC and Stryder and, as of the date of the Post, was fully aware of Buyer's expressed concerns and desire to rescind the Agreement. Yet, Roman falsely represented that Dropshipping Direct, Daniel's affiliate company, acquired Empire in the Post.

37.   The second slide of the Post begins with a header from Business Insider's mobile stock market site, Markets Insider, which suggests that the second slide is a screenshot of an article taken from Markets Insider's site.[3] The title of the article on this

---

[2] A search for this original article on both Bloomberg.com and Google.com yields no results, which suggests that the original article was either removed or never existed in the first place. Counsel for Plaintiffs have contacted Bloomberg about the Post and its legal department is conducting an independent investigation to determine the legitimacy of the article that forms the basis for the Post.

[3] A search for this original article on both Businessinsider.com and Google.com yields no results, which again suggests that the original article was either removed or never existed in the first place.

slide also says "Dropshipping Direct Announces Its Acquisition of Empire Ecommerce," thereby, repeating the false representation that Dropshipping Direct acquired Empire, and the slide contains the date and time of the purported publication, November 15, 2022 at 2:45 PM. There is no substance of the article provided on the second slide of the Post.

38.    Even more alarming, the Crestos doubled down on their fraud and engaged in a smear campaign.  On December 1 2022, Roman Cresto sent a mass e-mail to each and every one of Empire's clients. In his mass e-mail, Roman accused Daniel of making "false and defamatory statements" about Sellers. More specifically, Roman alleged the following:

> It has come to our attention that Mr. Cohen has expressed an intent to shut Empire down and that, in doing so, ***he has made numerous false claims about us***.  Needless to say, we are deeply shocked, disturbed, and saddened by this news, and we understand the anger and distress that this must have caused you as Empire's client.
>
> Rest assured that when we were exploring the sale of Empire—a business that we worked tirelessly to create and grow—we were looking for a buyer that was committed to its ongoing success and the success of you, as Empire's clients.  Until recently, we were confident that LCC Enterprises, led by Mr. Cohen, fit that bill.  Among other things, prior to the sale, we personally vetted Mr. Cohen and asked him numerous questions to ensure that he had the vision, resources, and abilities to take care of Empire's clients going forward.  Mr. Cohen also expressed to us that he was experienced in Empire's business and, further, that he had previously acquired two other automation companies.  As a result, we believed that Mr. Cohen was more than equipped to take care of Empire and its clients going into the future. ***Accordingly, even though it was not the highest bidder, we decided to sell Empire to LCC Enterprises because we thought***

-15-
COMPLAINT FOR DAMAGES

***it was most suitable to run Empire and manage its clients***. Further, to ensure Empire's success under its new ownership, we agreed to stay on as advisors after the sale to assist Mr. Cohen during the transition period.

For the above reasons, we are, quite frankly, baffled, perplexed, and disturbed by Mr. Cohen's recent announcement that he plans to shut down Empire without a plan to service you, its clients. ***We are further disturbed by the false and baseless claims Mr. Cohen has made to Empire's clients over the past few weeks, which appears to be part of an effort to justify his inaction with respect to running Empire and put the blame on someone else—us. The false claims made by Mr. Cohen—including, among other things, the egregious claim that we committed wire fraud— have already resulted in us receiving many threats to the safety of our parents and other family members. Mr. Cohen's flippant comments and accusations—which, to be clear, are false and defamatory— have put us and our families in physical danger, irreparably harmed our reputations, and caused our family members to become emotionally distressed and fear for their safety***.

We want to say thank you to a lot of you for sharing your direct conversations with Mr. Cohen in which ***he has made false claims and stated lies about us***.

(emphasis added) (the "Mass E-mail"). The factual representations in the Mass E-Mail (including those emphasized in bold italic above) are knowingly false.

39.    The Crestos' false statements do not end there. In addition to the Post and the Mass E-mail, the Crestos have published additional false statements in multiple publications, including but not limited to: (i) the identical press releases published on

Newsfilecorp.com[4] and Benzinga.com[5] about Dropshipping Direct's (and not LCC's) acquisition of Empire; (ii) the press release published on thecurrent.media[6] about Dropshipping Direct's acquisition of Empire; (iii) John Cresto's LinkedIn.com page where he purports to be the "Former Co-Founder of Empire Ecommerce (Acquired by Dropshipping Direct)"[7]; and (iv) Sellers' post on Empireecomm.com's homepage where they purport to be Daniel Cohen announcing his acquisition of Empire[8] (the Post, the Mass E-Mail, and subsections (i) through (iv) are collectively, the "Publications"). A copy of the Publications are attached hereto as **Composite Exhibit C**. These factual representations are knowingly false.

40.     All conditions precedent to the prosecution of this action have been performed, satisfied, excused or waived.

41.     Plaintiffs have been required to retain the services Fitzgerald & Isaacson, LLP and Perlman, Bajandas, Yevoli & Albright, P.L. (pro *hac vice* applications are forthcoming) to enforce its rights under the Agreement and prosecute this action.

---

[4] https://tinyurl.com/35x5spk2

[5] https://tinyurl.com/mrxarbdb

[6] https://tinyurl.com/yh7en4jp

[7] https://tinyurl.com/yc28r8sx

[8] https://tinyurl.com/ybenhbuw

**FIRST CAUSE OF ACTION**

**FRAUD IN THE INDUCEMENT**

**(Against Roman, John, and Stryder)**

42.     Plaintiffs repeat and re-allege Paragraphs 1 through 41 above as if set forth fully herein.

43.     Roman and John, both individually and as representatives and/or agents acting on behalf of Stryder, knowingly (i) made false and/or misleading statements of material fact to Buyer; (ii) concealed and omitted material information from Buyer; and (iii) made false material promises of future conduct to Buyer. This includes but is not limited to instances such as: on October 29, 2022, on a Zoom conference between John, Roman, and Daniel (i) John represented that Empire's clients consist primarily of "family and friends"; (ii) John represented that Empire was not facing any "lawsuits" or "liabilities" (Roman then agreed with John's point on the conference); and (iii) Roman represented that "a couple clients" had requested refunds in connection with their suspended Amazon stores, but he and John were confident they could "smooth things over" by staying on an extra month after the Agreement was executed and assist with transitioning their former clients over to Buyer. Sellers also showed Daniel financials and projections, and represented to Daniel that purchasing Empire would "[g]enerate passive income of 12-25% monthly profit splits" that Daniel would be able to get "35-50% of profit" recurring monthly from Empire's customers, and that the

Company was financially strong.   These misrepresentations, omissions and false promises are described above and are referred to in this claim as the "misrepresentations and omissions."

44.    Sellers were obligated to disclose omitted material facts, among other reasons, to prevent material statements and representations from being misleading, and were obligated to disclose material facts that are accurate and not misleading.

45.    Sellers intended to mislead Buyer and for Buyer to rely and act on the misrepresentations and omissions in order to induce Buyer into signing the Agreement.

46.    Buyer did, in fact, detrimentally rely upon these material misrepresentations and omissions.  The misrepresentations and omissions induced Buyer (i) to enter into the Agreement; (ii) to provide the Purchase Price to Sellers; (iii) to defer and/or lose other business opportunities in the industry, thereby, delaying Buyer's entry into this market; and (iv) to necessarily incur legal fees and costs and other expenses in connection with the Agreement.

47.    Buyer's reliance was reasonable and justified.  Had Buyer known the truth and not been misled by the misrepresentations and omissions, Buyer would not have entered into the Agreement, deferred and/or lost other market opportunities, or incurred significant fees, costs and expenses.

48.    As a direct and proximate result of the above and foregoing, Buyer has suffered and will continue to suffer damages in an amount to be proven at trial, with

said amount being in excess of the jurisdictional limit of seventy-five thousand dollars ($75,000.00).

49.     Sellers, in the aforementioned acts and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct under Civil Code Section 3294, and acted with willful and conscious disregard of Buyer's rights thereby, justifying the award of punitive and exemplary damages against Sellers, in an amount appropriate to punish and/or to set an example of Sellers.

## SECOND CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

### (Against Roman, John, and Stryder)

50.     Plaintiffs repeat and re-allege Paragraphs 1 through 41 above as if set forth fully herein.

51.     Roman and John both individually and as representatives and/or agents of Stryder, knowingly negligently represented, at least, the following: (i) Empire's projected returns to Buyer; (ii) that Empire's customers consisted of "family and friends"; (iii) that Empire was not facing any "lawsuits" or "liabilities"; (iv) and that "a couple clients" had requested refunds in connection with their suspended Amazon stores, but Roman and John were confident they could "smooth things over" by staying on an extra month after the Agreement was executed and assist with transitioning their former clients over to Buyer.

52.   Sellers' representations were not true as (i) Sellers' projected sales were completely untenable; (ii) a substantial amount of Empire's clients consisted of individuals that had no prior affiliation with Sellers; (iii) Empire was dealing with five different Open Matters prior all parties' execution of the Agreement; and (iv) customers were angry, even threatening, about the state of their online stores, and a substantial majority of them reported waiting six to eight months for stores that were never delivered.

53.   Even if Sellers purport to believe these representations to be true, they had no reasonable grounds for believing the representation to be true when made.

54.   Sellers intended for Buyer to rely and act on the misrepresentations and omissions in order induce Buyer to enter into the Agreement.

55.   Buyer did, in fact, detrimentally rely upon these misrepresentations and omissions.  The misrepresentations and omissions induced Buyer (i) to enter into the Agreement; (ii) to provide the Purchase Price to Seller; (iii) to defer and/or lose other business opportunities in the industry, thereby delaying Buyer's entry into the market; and (iv) to necessarily incur legal fees and costs and other expenses in connection with the Agreement.

56.   Buyer's reliance was reasonable and justified.  Buyer would not have entered into and funded the Agreement, conducted due diligence and investigation, deferred and/or lost other market opportunities, or incurred significant fees, costs and

expenses, but for Sellers' misrepresentations and omissions.

57.     As a direct and proximate result of the above and foregoing, Buyer has suffered and will continue to suffer damages in an amount to be proven at trial, with said amount being in excess of the jurisdictional limit of seventy-five thousand dollars ($75,000.00).

**THIRD CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against Roman, John, and Stryder)**

58.     Plaintiffs repeat and re-allege Paragraphs 1 through 41 above as if set forth fully herein.

59.     Buyer entered into the Agreement with Sellers for valuable consideration.

60.     Buyer has duly performed all promises, conditions, and agreements under the Agreement upon their part to be performed.

61.     Sellers materially breached the Agreement, in at least, the following particulars:

a.     by failing to disclose Empire's numerous liabilities, open matters, and events that are the subject of current, and may give rise to future, legal actions prior to Buyer and Sellers' execution of the agreement in accordance with Section 2.5 of the Agreement; and

b.     by failing to disclose Empire's numerous liabilities, open matters,

and events that as the subject of current, and may give rise to future, legal actions prior to Buyer and Sellers' execution of the agreement in accordance with Section 2.6 of the Agreement.

62.    As a result of the above and foregoing, Sellers have materially breached the terms and conditions of the Agreement.

63.    As a direct and proximate result of the above and foregoing, Buyer has suffered and will continue to suffer damages in an amount to be proven at trial, with said amount being in excess of the jurisdictional limit of seventy-five thousand dollars ($75,000.00).

## FOURTH CAUSE OF ACTION

### DEFAMATION

### (Against Roman)

64.    Plaintiffs repeat and re-allege Paragraphs 1 through 41 above as if set forth fully herein.

65.    On or about December 1, 2022, Defendant Roman sent a Mass Email to all of Empire's clients in which Defendant published or caused to be published defamatory statements that were false and not privileged.

66.    The defamatory statements Defendant Roman published in the Mass Email include, but are not limited to, the following:

a.    Daniel has "made numerous false claims about us.";

b.    "when we were exploring the sale of Empire … we were looking for a buyer that was committed to its ongoing success and the success of you, as Empire's clients.  Until recently, we were confident that LCC Enterprises, led by Mr. Cohen, fit that bill.";

c.    "even though it was not the highest bidder, we decided to sell Empire to LCC Enterprises because we thought it was suitable to run Empire and manage its clients.";

d.    Daniel has made "false and baseless claims" "to Empire's clients over the past few weeks";

e.    Daniel is trying "to justify his inaction with respect to running Empire and  to put the blame on someone else—us."; and

f.    In direct conversations with clients, Daniel "has made false claims and lies about us.".

67.    The statements were made of and concerning Plaintiffs and were so understood by those who read the statements.

68.    The statements are false. Defendant Roman knew the statements were false, made the statements with the intention to harm Plaintiffs for Defendants' own economic gain and with wanton disregard for the truth or falsity of the statements, and failed to use reasonable care to determine the truth or falsity of the statements.

69.    The defamatory statements directly injured Plaintiffs in their business and

trade by impugning the integrity of Daniel and his commitment to serving clients, and calling into question LCC's ability and commitment to serve clients, and otherwise, accuse Plaintiffs of conduct, which by its very nature, tends to injure Plaintiffs' personal and/or professional reputations.

70.     As a proximate result of Defendants' publication of the statements, Plaintiffs have suffered and continue to suffer damage from loss of reputation and good-will for their goods and services in an amount exceeding the jurisdiction of this court. As a further proximate result of Defendants' publication of the statements, Plaintiffs suffer and continue to suffer special damages of lost profits in an amount of a nature according to proof at trial.

71.     Roman, in the aforementioned acts and/or ratifying of such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct under Civil Code Section 3294, and acted with willful and conscious disregard of Plaintiffs' rights, thereby, justifying the award of punitive and exemplary damages, against Roman, in an amount appropriate to punish and/or to set an example of Roman.

## FIFTH CAUSE OF ACTION

**VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.***

**(Against all Defendants)**

72.     Plaintiff repeat and re-allege Paragraphs 1 through 41 above as if set forth fully herein.

73.     Business and Professions Code § 17200, et seq. (the "Unfair Competition Law" or "UCL") prohibits any unlawful, unfair, or fraudulent business act or practice, any unfair, deceptive, untrue, or misleading advertising.

74.     This statute was enacted to protect honest businesspersons and consumers from such unlawful, unfair or fraudulent business practices.  Plaintiffs are in the class of persons the statute was intended to protect.  The statute specifically permits a cause of action seeking injunctive relief and restoration of money to protect honest businesspersons and consumers from persons and companies such as Defendants herein.  The statute permits the restoration of money wrongfully obtained by such unlawful, unfair or fraudulent business practices.

75.     Defendants, by and through their agents, and others have violated the UCL by engaging in unlawful, unfair, and fraudulent business practices, acts, and schemes, including without limitation the following:

a.     fraudulently inducing Plaintiffs to enter into the Agreement;

b.     breaching the Agreement as to the Sellers' representations;

c.     making and disseminating false, misleading, and deceptive statements; and

d.     unlawfully interfering with the Company's business relationship with its customers.

76.   These acts and practices, as described in ¶¶ 75 above, violate UCL in the following respects:

a.   Defendants' practices constitute an unlawful and/or unfair business act or practice within the meaning of Business and Professions Code § 17200.

b.   The harm to Plaintiffs *and to members of the general public* outweighs the utility of Defendants' practices and acts and, consequently, Defendants' practices above in ¶ 75 and herein described  constitute an unfair business act of practice within the meaning of Business and Professions Code § 17200.

c.   Defendants' practices are likely to mislead the general public and, consequently, constitute a fraudulent business act or practice within the meaning of Business and Professions Code § 17200.

77.   Defendants' wrongful conduct, unless restrained by order of this Court, will continue to cause great and irreparable harm of Plaintiffs and the consumer public at large.   Plaintiffs are entitled to preliminary and permanent injunctive relief prohibiting Defendants from unfair competition, and to restore to Plaintiffs their money in the amount of the Purchase Price of the Agreement and any other monies which are derived from Defendants' gains from their deceptive scheme, as it would be unjust for Defendants to retain any such monies and such an outcome would result in Defendants being unjustly enriched at the expense of Plaintiffs.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, and each of them as follows:

(1)    For compensatory damages against each Defendant in the amount exceeding the jurisdictional limits of this Court according to proof at trial;

(2)    For general, incidental, and consequential damages against each Defendant in the amount exceeding the jurisdictional limits of this Court according to proof at trial;

(3)    For exemplary and punitive damages against each Defendant exceeding the jurisdictional limits of this Court according to proof at trial;

(4)    For reasonable attorney's fees incurred by reason of bringing this suit;

(5)    For costs of suit incurred herein;

(6)    For interest in damages as set forth herein; and

(7)    For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury on all causes of action so triable.

Dated: December 8, 2022               **FITZGERALD & ISAACSON, LLP**

By:   /s/ Diana L. Fitzgerald
      Diana L. Fitzgerald

*Attorneys for Plaintiffs LCC Enterprises LLC and Daniel Cohen*

COMPLAINT FOR DAMAGES