**STUBBS ALDERTON & MARKILES, LLP**
Daniel A. Rozansky (SBN 161647)
*drozansky@stubbsalderton.com*
John R. De La Merced (SBN 303060)
*jdelamerced@stubbsalderton.com*
Blaine A. O'Malley (SBN 319017)
*bomalley@stubbsalderton.com*
15260 Ventura Blvd., 20th Floor
Sherman Oaks, California 91403
Telephone:     (818) 444-4500
Facsimile:     (818) 444-4520

Attorneys for Defendants / Counterclaimants
Roman Cresto, John Cresto, and
Stryder Holdings LLC

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LCC ENTERPRISES LLC, a Delaware limited liability company, and DANIEL COHEN, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> ROMAN CRESTO, an individual, JOHN CRESTO, an individual, and STRYDER HOLDINGS LLC, a California limited liability company, <br><br> Defendants. | Case No.:  22CV1944 DMS BGS <br><br> **DEFENDANTS / COUNTERCLAIMANTS ROMAN CRESTO, JOHN CRESTO, AND STRYDER HOLDINGS LLC'S ANSWER TO FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM FOR:** <br> **1) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> **2) DEFAMATION;** <br> **3) BREACH OF CONTRACT;** <br> **4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND** <br> **5) PROMISSORY FRAUD** |
| ROMAN CRESTO, an individual, JOHN CRESTO, an individual, and STRYDER HOLDINGS LLC, a California limited liability company, <br><br> Counterclaimants, <br><br> v. <br><br> LCC ENTERPRISES LLC, a Delaware Limited liability company, DANIEL COHEN, an individual, and DROPSHIPPING DIRECT LLC, a Wyoming limited liability company, <br><br> Counterdefendants. | **DEMAND FOR JURY TRIAL** |

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

---

**DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM**

Defendants ROMAN CRESTO ("Roman"), JOHN CRESTO ("John" and, together with Roman, the "Crestos"), and STRYDER HOLDINGS LLC ("Stryder") (collectively, "Defendants"), by and through their attorneys of record, hereby answer Plaintiffs LCC ENTERPRISES LLC ("LCC") and DANIEL COHEN'S ("Cohen") (collectively, "Plaintiffs") First Amended Complaint ("FAC"), as follows:

## INTRODUCTION

1.     In answer to the allegations in Paragraph 1 of the FAC, Defendants admit that Empire Ecommerce LLC's ("Empire") website previously stated words to the effect of "easiest way to build, scale, and run your Amazon, Facebook or Walmart marketplace e-commerce store" and that an Empire client testimonial stated words to the effect of "the ability to make money while I sleep".  With respect to the remaining allegations in Paragraph 1, Defendants deny each and every remaining allegation contained therein.

2.     In answer to the allegations in Paragraph 2 of the FAC, Defendants admit that Onyx Distribution LLC ("Onyx") is a wholly owned subsidiary of Empire that was indirectly acquired by LCC through its acquisition of Empire.  Defendants further admit that Stryder sold its interest in Empire to LCC, and that Cohen is the owner and principal of LCC.  With respect to the remaining allegations in Paragraph 2, Defendants deny each and every remaining allegation contained therein.

## PARTIES

3.     In answer to the allegations in Paragraph 3 of the FAC, Defendants admit the allegations contained therein.

4.     In answer to the allegations in Paragraph 4 of the FAC, Defendants admit the allegations contained therein.

5.     In answer to the allegations in Paragraph 5 of the FAC, Defendants admit the allegations contained therein.

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

6.      In answer to the allegations in Paragraph 6 of the FAC, Defendants admit the allegations contained therein.

7.      In answer to the allegations in Paragraph 7 of the FAC, Defendants admit the allegations contained therein.

## JURISDICTION AND VENUE

8.      In answer to the allegations in Paragraph 8 of the FAC, Defendants admit that they are located in the County of San Diego, State of California and that this Court has personal jurisdiction over Defendants as they reside in this jurisdiction.  Defendants further admit that Stryder consented to the jurisdiction of state or federal court in the County of San Diego pursuant to the Membership Interest Purchase Agreement ("MIPA") that is the subject of this action, but only for claims arising from that agreement.  With respect to the remaining allegations in Paragraph 8, Defendants deny each and every remaining allegation contained therein.

9.      In answer to the allegations in Paragraph 9 of the FAC, Defendants admit the allegations contained therein.

10.     In answer to the allegations in Paragraph 10 of the FAC, Defendants admit that venue is proper in this judicial district under 28 U.S.C. § 1391 and that Stryder expressly consented to such venue in the MIPA.  With respect to the remaining allegations in Paragraph 10, Defendants deny each and every remaining allegation contained therein.

## GENERAL ALLEGATIONS

## I.      THE DECEPTIVE SCHEME DEFRAUDING PLAINTIFFS

11.     In answer to the allegations in Paragraph 11 of the FAC, Defendants admit that Stryder is a holding company wholly owned by the Crestos, and further admit that Stryder was the sole member of Empire until Empire was sold to LCC.  Defendants further admit that Onyx is a wholly owned subsidiary of Empire which, in some instances, contracted directly with certain customers that did business with Empire.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

With respect to the remaining allegations in Paragraph 11, Defendants deny each and every remaining allegation contained therein.

12.     In answer to the allegations in Paragraph 12 of the FAC, Defendants admit the allegations contained therein.

13.     In answer to the allegations in Paragraph 13 of the FAC, Defendants admit the allegations contained therein.

14.     In answer to the allegations in Paragraph 14 of the FAC, Defendants deny the allegations contained therein.

15.     In answer to the allegations in Paragraph 15 of the FAC, Defendants deny each and every allegation contained therein.

16.     In answer to the allegations in Paragraph 16 of the FAC, Defendants admit the allegations contained therein.

17.     In answer to the allegations in Paragraph 17 of the FAC, Defendants admit that Roman shared requested financials for Empire with Cohen, and further admit that Roman stated or wrote the words "[g]enerate passive income of 12-25% monthly profit splits" to Cohen.   With respect to the remaining allegations in Paragraph 17, Defendants deny each and every remaining allegation contained therein, including but not limited to the allegation that Roman showed Cohen financials or stated/wrote the above-quoted words "[t]o induce [Cohen] into entering into the agreement to purchase Empire (and Onyx indirectly)".

18.     In answer to the allegations in Paragraph 18 of the FAC, Defendants admit that Cohen performed due diligence.  Defendants further admit that John represented to Cohen that Empire was not a party to any active lawsuits, but they deny that such representation was made on October 29, 2022. With respect to the remaining allegations in Paragraph 18, Defendants deny the remaining allegations contained therein.

19.     In answer to the allegations in Paragraph 19 of the FAC, Defendants deny each and every allegation contained therein.

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

20. In answer to the allegations in Paragraph 20 of the FAC, Defendants admit that on November 7, 2022, Roman, on behalf of Stryder, and Cohen, on behalf of LCC, executed the Membership Interest Purchase Agreement ("MIPA") for LCC's purchase of Empire. Defendants also admit that a copy of the MIPA is attached as Exhibit A to Plaintiffs' original Complaint. Defendants further admit that Exhibit A to the FAC appears to be a November 7, 2022 email from DocuSign to Cohen stating, in part, "All parties have completed Complete with DocuSign: Empire Ecommerce - Membership Interest Purchase Agreement.docx". With respect to the remaining allegations in Paragraph 20, Defendants deny each and every remaining allegation contained therein, including the allegations that John signed the Membership Interest Purchase Agreement ("MIPA") on behalf of Stryder, and that Roman and John were "Seller[s]" under the MIPA.

21. In answer to the allegations in Paragraph 21 of the FAC, Defendants admit that in Section 2.5 of the MIPA, Stryder represented that "[t]he Company has no liabilities or indebtedness of any kind, accrued or unaccrued." Defendants deny that Roman and John made and representations under Section 2.5 of the MIPA.

22. In answer to the allegations in Paragraph 22 of the FAC, Defendants admit that in Section 2.6 of the MIPA, Stryder represented that "[t]here is no legal proceeding . . . litigation, suit, or other proceeding (whether civil, criminal, administrative, judicial, or investigative, whether formal or informal, whether public or private) commenced or brought by any person or entity, or conducted or heard by or before, or otherwise involving, any court or . . . any arbitrator or arbitration panel ("*Action*") of any nature pending or threatened by or, to Seller's knowledge, against Seller or the Company . . . ." Defendants deny that Roman and John made and representations under Section 2.6 of the MIPA.

23. In answer to the allegations in Paragraph 23 of the FAC, Defendants admit the allegations contained therein.

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

24.     In answer to the allegations in Paragraph 24 of the FAC, Defendants admit that LCC agreed to purchase the Company and Plaintiffs wired (or caused to be wired) the purchase price as provided in the MIPA to Stryder on November 8, 2022. Defendants further admit that Exhibit B to the FAC appears to reflect a wire transfer of the purchase price as provided in the MIPA to Stryder.     With respect to the remaining allegations in Paragraph 24, Defendants deny the remaining allegations contained therein.

## II.     THE CURTAIN OF DEFENDANTS' DECEPTION IS UNVEILED

25.     In answer to the allegations in Paragraph 25 of the FAC, Defendants admit that on November 9, 2022, Plaintiffs and Defendants participated in a Zoom integration call and further admit that Roman shared a folder entitled "Dan Cohen Integration Folder" via Dropbox, which contained a memorandum titled "Stubbs Alderton & Markiles, LLP's Open Matters for Empire Ecommerce LLC and Onyx Distribution LLC".   With respect to the remaining allegations in Paragraph 25, Defendants deny the remaining allegations contained therein.

26.     In answer to the allegations in Paragraph 26 of the FAC, Defendants admit that Cohen reviewed at least part of the Open Matters memorandum while still on the Zoom integration call.  Further answering the allegations in Paragraph 26, Defendants admit that the memorandum regarding Open Matters included (i) a matter in which an Empire client claimed breach of contract and fraud against Empire; (ii) a matter in which an Empire client claimed breach of contract and fraud in the inducement against Empire and Onyx; (iii) a matter with an Empire client who alleged that Empire grossly mismanaged her Walmart and Amazon stores in violation of the Dropshipping Service Agreement and fraudulently misrepresented Empire's ability to operate e-commerce stores on Walmart's and Amazon's platforms; (iv) a suspended arbitration initiated by Empire and Onyx against one of their former clients; and (v) a bankruptcy proceeding related to the same former client.  Defendants deny the remaining allegations in Paragraph 26, including the allegation that Cohen first learned of the Open Matters

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

during the call, and the allegation that Empire and Onyx were "actively involved in five different open legal matters".

27.  In answer to the allegations in Paragraph 27 of the FAC, Defendants deny the allegations contained therein.

28.  In answer to the allegations in Paragraph 28 of the FAC, Defendants admit that the "Effective Date" of the MIPA is November 11, 2022, and deny that the Open Matters were disclosed on November 9, 2022.  Defendants admit that on or about November 11, 2022, Plaintiffs and Defendants together began contacting Empire's clients to inform them of the new ownership change.  Further answering the allegations in Paragraph 28, Defendants admit that an "aged store" is a store that already has a record history (i.e., sales history, customer reviews, and trust with Amazon).  With respect to the remaining allegations in Paragraph 28, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, deny those allegations.

29.  In answer to the allegations in Paragraph 29 of the FAC, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, deny those allegations.

30.  In answer to the allegations in Paragraph 30 of the FAC, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, deny those allegations.

31.  In answer to the allegations in Paragraph 31 of the FAC, Defendants deny the allegation that they engaged in fraudulent conduct.  As to the remaining allegations in Paragraph 31, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, deny those allegations.

32.  In answer to the allegations in Paragraph 32 of the FAC, Defendants admit that Cohen approached the Crestos about rescinding the MIPA.  Defendants deny the remaining allegations in Paragraph 32 of the FAC.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

33.     In answer to the allegations in Paragraph 33 of the FAC, Defendants admit that on November 23, 2022, Cohen called Roman and advised him that some clients claimed to have never received accounts that they paid for and that the Crestos misrepresented the state of the Empire.  Defendants also admit that Roman told Cohen he would call Cohen back with John and ended the call.  Defendants further admit that John and Roman called Cohen later that day and that, during this call, Cohen asked John and Roman to take Empire back.  As to the remaining allegations in Paragraph 33, Defendants deny the remaining allegations contained therein.

34.     In answer to the allegations in Paragraph 34 of the FAC, Defendants admit the allegations contained therein.

35.     In answer to the allegations in Paragraph 35 of the FAC, Defendants deny the allegations contained therein.

36.     In answer to the allegations in Paragraph 36 of the FAC, Defendants deny the allegations contained therein.

37.     In answer to the allegations in Paragraph 37 of the FAC, Defendants admit that Defendants have refused to rescind the MIPA.  Defendants deny each and every remaining allegation in Paragraph 37 of the FAC.

38.     In answer to the allegations in Paragraph 38 of the FAC, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, deny those allegations.

39.     In answer to the allegations in Paragraph 39 of the FAC, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, deny those allegations.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

## FIRST CAUSE OF ACTION

## FRAUD IN THE INDUCEMENT

## (Against Roman, John, and Stryder)

40.   In answer to the allegations in Paragraph 40 of the FAC, Defendants incorporate their responses to the allegations contained in Paragraphs 1-39, above, as though set forth in full herein.

41.   In answer to the allegations in Paragraph 41 of the FAC, Defendants deny the allegations contained therein.

42.   In answer to the allegations in Paragraph 42 of the FAC, Defendants deny the allegations contained therein.

43.   In answer to the allegations in Paragraph 43 of the FAC, Defendants deny the allegations contained therein.

44.   In answer to the allegations in Paragraph 44 of the FAC, Defendants deny the allegations contained therein.

45.   In answer to the allegations in Paragraph 45 of the FAC, Defendants deny the allegations contained therein.

46.   In answer to the allegations in Paragraph 46 of the FAC, Defendants deny the allegations contained therein.

47.   In answer to the allegations in Paragraph 47 of the FAC, Defendants deny the allegations contained therein.

## SECOND CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

## (Against Roman, John, and Stryder)

48.   In answer to the allegations in Paragraph 48 of the FAC, Defendants incorporate their responses to the allegations contained in Paragraphs 1-47, above, as though set forth in full herein.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

49.     In answer to the allegations in Paragraph 49 of the FAC, Defendants deny making any knowingly negligent misrepresentations and, on that basis, deny the allegations contained therein.

50.     In answer to the allegations in Paragraph 50 of the FAC, Defendants deny making any knowingly negligent misrepresentations and, on that basis, deny the allegations contained therein.

51.     In answer to the allegations in Paragraph 51 of the FAC, Defendants deny the allegations contained therein.

52.     In answer to the allegations in Paragraph 52 of the FAC, Defendants deny the allegations contained therein.

53.     In answer to the allegations in Paragraph 53 of the FAC, Defendants deny the allegations contained therein.

54.     In answer to the allegations in Paragraph 54 of the FAC, Defendants deny the allegations contained therein.

55.     In answer to the allegations in Paragraph 55 of the FAC, Defendants deny the allegations contained therein.

## THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Roman, John, and Stryder)

56.     In answer to the allegations in Paragraph 56 of the FAC, Defendants incorporate their responses to the allegations contained in Paragraphs 1-55, above, as though set forth in full herein.

57.     In answer to the allegations in Paragraph 57 of the FAC, Defendants admit that Stryder entered into the MIPA with LCC for valuable consideration.  Defendants deny the remaining allegations contained in Paragraph 57, including the allegation that the Crestos or Cohen entered into the Agreement.

58.     In answer to the allegations in Paragraph 58 of the FAC, Defendants deny the allegations contained therein.

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

59.     In answer to the allegations in Paragraph 59 of the FAC, Defendants deny the allegations contained therein.

60.     In answer to the allegations in Paragraph 60 of the FAC, Defendants deny the allegations contained therein.

61.     In answer to the allegations in Paragraph 61 of the FAC, Defendants deny the allegations contained therein.

## FOURTH CAUSE OF ACTION

## VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.*

## (Against All Defendants)

62.     In answer to the allegations in Paragraph 62 of the FAC, Defendants incorporate their responses to the allegations contained in Paragraphs 1-61, above, as though set forth in full herein.

63.     In answer to the allegations in Paragraph 63 of the FAC, Defendants admit the allegations contained therein.

64.     In answer to the allegations in Paragraph 64 of the FAC, Defendants admit that Business and Professions Code section 17203 provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction" and that it further provides that "[t]he court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition". As to the allegations that "[t]his statute was enacted to protect honest businesspersons and consumers from such unlawful, unfair or fraudulent business practices" and "Plaintiffs are in the class of persons the statute was intended to protect", Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, deny those allegations.

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

With respect to the remaining allegations in Paragraph 64, Defendants deny each and every remaining allegation contained therein.

65.    In answer to the allegations in Paragraph 65 of the FAC, Defendants deny the allegations contained therein.

66.    In answer to the allegations in Paragraph 66 of the FAC, Defendants deny the allegations contained therein.

67.    In answer to the allegations in Paragraph 67 of the FAC, Defendants deny the allegations contained therein.

## RESPONSE TO PRAYER FOR RELIEF

In response to Plaintiffs' Prayer for Relief, Defendants deny that Plaintiffs, or any of them, are entitled to a monetary award of any sort (whether damages, including but not limited to compensatory damages, general, incidental, or consequential damages, exemplary or punitive damages, attorneys' fees, interest, costs, or anything else), injunctive relief of any sort, declaratory relief of any sort, or any other relief from or against Defendants, or any of them.

WHEREFORE, Defendants pray for judgment as follows:

1.    That Plaintiffs take nothing by virtue of their FAC and be afforded no relief herein;

2.    For Defendants' reasonable attorneys' fees and costs to the extent permitted by law; and

3.    For such other relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

As separate and distinct defenses to the FAC, Defendants allege as follows:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

Each claim alleged in the FAC fails to state facts sufficient to constitute a claim upon which relief can be granted.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

## SECOND AFFIRMATIVE DEFENSE

### (Acquiescence, Estoppel, Laches, Waiver)

The FAC, and each purported claim for relief therein, is barred (in whole or in part) because of the doctrines of acquiescence, estoppel, laches, and/or waiver.

## THIRD AFFIRMATIVE DEFENSE

### (Unclean Hands)

The FAC is barred (in whole or in part) by reason of Plaintiffs' unclean hands with respect to the subject of the FAC, which caused injury to Defendants.

## FOURTH AFFIRMATIVE DEFENSE

### (Material Breach)

The FAC is barred (in whole or in part) by reason of LCC's material breaches of the MIPA, as detailed in Defendants' Counterclaim, which is hereby incorporated by reference as if set forth in full herein.

## FIFTH AFFIRMATIVE DEFENSE

### (No Damages)

The FAC is barred (in whole or in part) because Plaintiffs have sustained no loss or damage for which a reasonable opportunity for investigation or discovery is likely to provide evidentiary support.

## SIXTH AFFIRMATIVE DEFENSE

### (Set-Off)

To the extent Plaintiffs have any right to damages, Plaintiffs' damages must be reduced or eliminated by the damages they each owe to Defendants, or each of them, by way of their actionable conduct, as further alleged in the Counterclaim.

## SEVENTH AFFIRMATIVE DEFENSE

### (Speculative Damages)

To the extent Plaintiffs have suffered any damages, which Defendants deny, Plaintiffs' damages are entirely speculative.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

To the extent Plaintiffs have suffered any damages, which Defendants deny, Plaintiffs failed to discharge their duty to mitigate damages. Indeed, Plaintiffs did quite the opposite. In particular, as further alleged in the Counterclaim, shortly after the execution of the MIPA, Plaintiffs decided to shut down Empire and cease its operations.

## NINTH AFFIRMATIVE DEFENSE

### (Actions Not Unfair or Unlawful)

Defendants cannot be liable for any alleged violation of the California Business and Professions Code § 17200 because their actions were not unfair, unlawful, fraudulent, nor likely to mislead, and their conduct and dealings were lawful, as authorized by applicable state and federal statutes, rules, and regulations, and such actions, conduct, and dealings were carried out in good faith and for legitimate business purposes.

## TENTH AFFIRMATIVE DEFENSE

### (Consent)

Plaintiffs' claims are barred (in whole or in part) because Plaintiffs consented to Defendants' actions.

## ELEVENTH AFFIRMATIVE DEFENSE

### (No Standing)

Plaintiffs' claims are barred to the extent they lack standing to assert them.

## TWELFTH AFFIRMATIVE DEFENSE

### (Adequate Remedy at Law)

Plaintiffs' claim for injunctive relief should be denied because Plaintiffs have an adequate remedy at law.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Substantial Compliance)

To the extent Defendants breached any part of the MIPA, which they deny, they substantially complied with the terms thereof.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Fraud)

The FAC is barred (in whole or in part) by virtue of the fact that Plaintiffs fraudulently induced Stryder to enter into the MIPA, as detailed in Defendants' Counterclaim, which is hereby incorporated by reference as if set forth in full herein.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Limitation of Liability)

To the extent Defendants are found liable to Plaintiffs, such liability shall be limited by the limitations on liability set forth in Section 5.4 of the MIPA.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (No Consequential Damages)

Pursuant to Section 5.8 of the MIPA, Defendants shall not be liable to Plaintiffs for any special, indirect, incidental, or consequential damages resulting from the breach of any representation, warranty, or covenant contained in the MIPA or any claim arising from the MIPA or the transactions contemplated thereby.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Contributory/Comparative Fault of Plaintiffs)

To the extent Plaintiffs suffered any harm (which Defendants deny), Plaintiffs' own negligence and carelessness was a substantial factor in causing their harm and, accordingly, the doctrine of contributory/comparative fault should be applied in the event liability is found against Defendants, or any of them.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (No Reasonable Reliance)

Plaintiffs' claims are barred (in whole or in part) because Plaintiffs did not rely on any alleged misrepresentation made or omission concealed by Defendants, or each of them, if any.

## NINTEENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

Plaintiffs' claims are barred (in whole or in part) by the doctrine of unjust enrichment.  Under the circumstances, allowing recovery (in whole or in part) would result in Plaintiffs (or each of them) receiving more money than they are entitled to.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Privilege)

Plaintiffs' claims are barred (in whole or in part) because the conduct of Defendants was at all times justified and privileged.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Further Affirmative Defenses)

Defendants lack sufficient knowledge or information to form a belief as to whether they have additional separate or affirmative defenses not stated in this Answer to the FAC. Defendants reserve the right to assert additional separate or affirmative defenses based on further discovery, investigation, or analysis.

Dated:  April 18, 2023      **STUBBS ALDERTON & MARKILES, LLP**

By: */s/ Daniel A. Rozansky*
    Daniel A. Rozansky
    John R. De La Merced
    Blaine A. O'Malley

Attorneys for Defendants / Counterclaimants
Roman Cresto, John Cresto, and Stryder
Holdings LLC

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

## **COUNTERCLAIM**

Defendants / Counterclaimants   ROMAN CRESTO ("Roman"), JOHN CRESTO ("John" and, together with Roman, the "Crestos"), and STRYDER HOLDINGS LLC ("Stryder") (collectively, "Counterclaimants"), by and through their attorneys of record, hereby allege the following counterclaims against Plaintiffs / Counterdefendants DANIEL COHEN ("Cohen") and LCC ENTERPRISES LLC ("LCC") and Counterdefendant DROPSHIPPING DIRECT LLC ("Dropshipping Direct") (with Cohen and LCC, collectively, "Counterdefendants") as follows:

## **INTRODUCTION**

1.   This Counterclaim details Counterdefendants' fraudulent scheme to loot third-party Empire Ecommerce LLC's ("Empire") assets under the guise of a legitimate acquisition and defame the Crestos' business reputation, all for the benefit of Cohen and his competing venture, Dropshipping Direct.

2.   In 2018, Roman founded Empire, a company specializing in the management of dropshipping/e-commerce stores.  In exchange for a flat base fee and a percentage of the stores' operating income, Empire helped its clients launch and build their e-commerce stores on a platform like Amazon or Walmart, populate the stores with products for sale, and run the stores, thereby enabling clients to bring in revenue without having to expend the time and acquire the skills necessary to launch, build, and manage their own stores.  Roman's cousin John joined Empire in 2020, and the two grew Empire into a successful business that generated millions of dollars in revenue a year.

3.   After years of achieving positive results for Empire and its clients, the Crestos decided to sell Empire to embark on a new business venture, and they specifically sought out a buyer who was experienced in the industry and had the qualifications necessary to continue to successfully operate Empire and service its clients' stores.  They thought Cohen, through LCC, was that buyer.  After all, Cohen, LCC's principal, had been in the dropshipping/e-commerce industry for over a decade.

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

Further, in addition to starting his own e-commerce automation business like Empire (specifically, Dropshipping Direct, also doing business under the name Ecom Authority), Cohen claimed he had successfully acquired and operated two other e-commerce automation businesses (just like Empire). Importantly, Cohen and LCC promised and represented to Counterclaimants that they would continue to service Empire's clients and operate its business as a going concern for at least a year after the sale. As part of this, Cohen and LCC promised to continue the process of transitioning roughly 150 of Empire's clients' stores from the dropshipping business model to the more desirable "Fulfilled by Amazon" ("FBA") model—a process that Empire had recently commenced after securing a relationship with a highly coveted FBA service provider. The relationship included very favorable terms such as client onboarding rates discounted by more than sixty-five percent, a waiver of monthly fees for the first 180 clients onboarded (the approximate number of Empire clients that would transition to FBA), a lower profit split charge by the FBA provider, and high-capacity onboarding slots to get clients going faster than otherwise would have been possible. Relying on Cohen and LCC's representations, Counterclaimants decided to sell Empire to LCC. As a sign of their continued investment in Empire's success, pursuant to the purchase agreement, Counterclaimants agreed to receive the bulk of their compensation in the form of a revenue split that was to be paid out in the year following the sale, and further agreed to serve as advisors and affiliate teammates.

4. Not long after the parties executed the purchase agreement, Counterclaimants came to the troubling realization that Cohen and LCC had no intention of operating Empire as a going concern or servicing its clients' stores, as they had promised. Rather, Cohen and LCC simply wanted to use and exploit Empire's best and most valuable assets—including its FBA service provider, among others—to salvage and expand the business of Dropshipping Direct, Cohen's other company and a competitor of Empire. Before LCC's acquisition of Empire, Cohen *initially* expressed that he was "not a fan" of the FBA model. However, he *became*

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

extremely interested after realizing the benefits of this particular FBA connection. During diligence, Dropshipping Direct—which exclusively operated under the 2-step dropshipping model—was experiencing serious fulfillment issues that resulted in stores being "paused", meaning they were not generating any revenue. Because of its extensive supplier relationships, Empire's FBA service provider could correct these fulfillment issues. In addition to correcting fulfillment issues for dropshipping stores, access to the FBA service provider also offered opportunity for expansion into business under the increasingly popular FBA model. After purchasing Empire and gaining access to the FBA provider, Cohen and Dropshipping Direct were able to utilize the FBA model under the name Ecom Authority. Per its website, Ecom Authority appears to offer *only* FBA services. Before purchasing Empire, and despite the fact that the e-commerce industry was trending toward the FBA business model, Dropshipping Direct did not offer stores operating under the FBA model, and Cohen did not have a relationship any FBA service provider, much less an FBA service provider with Empire's FBA provider's capabilities. Access to Empire's particular FBA provider was crucial for Dropshipping Direct because (1) it had the infrastructure and supplier relationships necessary to remedy the fulfillment issues Dropshipping Direct was facing so that it could resume operating its stores; and (2) it would allow Dropshipping Direct to expand its business from the dropshipping model to the more favorable FBA model. Indeed, shortly after its introduction to Empire's FBA supplier, Cohen and/or Dropshipping Direct entered an exclusive partnership with the FBA supplier, effectively monopolizing the resource. To be clear, Cohen would not have an FBA business (Ecom Authority)— much less a functional e-commerce business — if it were not for the acquisition.

5.    Immediately after signing the purchase agreement, Cohen asked the Crestos about Empire's FBA provider at least six times within a seven-hour period. Cohen was timely introduced to the FBA provider after it had been informed about the change of ownership. However, instead of facilitating the process of transitioning

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

*Empire's* clients' stores to the FBA provider, Cohen ignored the needs of Empire's clients and instead initiated the process of using Empire's FBA provider for *Dropshipping Direct's* clients. As a result of its access to Empire's FBA provider, Dropshipping Direct and/or its d.b.a., Ecom Authority, went from operating no FBA stores to operating hundreds of FBA stores within just months of the sale. Counterclaimants are informed and believe, and based thereon allege, that Cohen and Dropshipping Direct similarly absconded with other valuable assets that LCC obtained in connection with the purchase of Empire, including Empire's aged account suppliers, its well-developed form of contracts and templates, and its fully customized Salesforce client management software which cost more than $250,000 to develop and implement. As further part of their plan to exploit Empire for the benefit of Dropshipping Direct, Cohen and LCC cherry-picked Empire's best customers and moved them to Dropshipping Direct and/or its d.b.a., Ecom Authority, thereby depriving Counterclaimants of the revenue share they were entitled to under the purchase agreement, and essentially leaving Empire as a nearly empty shell, occupied only by Empire's less profitable clients.

6.    While Counterdefendants were busy attempting to poach Empire's clients and loot Empire's most valuable assets, Cohen effectively torched Empire's business by, among other things, neglecting to service Empire's clients and their stores, including by making little to no effort to transition Empire's clients to its FBA provider, as he and LCC had promised. At the same time, Cohen failed to respond to communications from Empire's clients. Against the advice of Roman and John, Cohen terminated most of Empire's employees and contractors—even though there were hundreds of Empire clients to service. Cohen utilized the skills and know-how of the Empire employees and contractors he did retain for up to a month after the sale. Most if not all of these employees and contractors received zero pay for the entire duration of LCC's ownership of Empire.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

7.     Once Counterdefendants had obtained what they actually wanted out of the purchase—specifically, Empire's FBA provider, clients, and other valuable assets—Cohen and LCC shut Empire down and ceased its operations *just three weeks after the sale*.  Shortly thereafter, Cohen caused a petition commencing an assignment for the benefit of Empire's creditors ("ABC") to be filed in Florida.  After all, once Dropshipping Direct had obtained Empire's FBA provider and Cohen had moved whatever Empire clients he thought were worth keeping over to Dropshipping Direct/Ecom Authority, Cohen had no reason to keep running Empire as a going concern.  At that time, many of Empire's remaining stores were suspended or on pause as they had been part of a wave of Amazon store suspensions affecting Amazon dropshippers industry-wide.  And, now that Dropshipping Direct/Ecom Authority was in a position to thrive, Cohen had no reason to dedicate the time or resources necessary to get the remaining suspended or paused Empire stores up and running.  Instead, he could simply commence an ABC and absolve himself of liability.  Simply put, Cohen orchestrated the perfect deal: For the purchase price provided in the MIPA, Cohen acquired an FBA provider and other valuable assets, saved Dropshipping Direct's/Ecom Authority's business, and absolved himself of liability.

8.     Worse yet, knowing full well that Empire's clients would not react kindly to the news that Empire would be ceasing its operations, Cohen intentionally misrepresented the reasons underlying his decision to shut down the company.  To keep the mob of angry Empire clients off his tail, Cohen blamed his decision to shut down the company on Roman and John and simultaneously embarked on a smear campaign against them.  Among other falsities, Cohen told Empire's clients and employees/contractors that Roman and John had engaged in fraud and had operated a sham business, and that their purported mismanagement of Empire and concealment of its "unquantifiable liabilities" in connection with sale left him with no choice but to shut Empire down.  Though Cohen strongly implied that Empire did not have the financial resources to address the so-called "unquantifiable liabilities" purportedly

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

concealed by the Crestos, he neglected to mention that he had provided several of Empire's most valuable assets—namely, its FBA service provider, aged account suppliers, and clients—to his other company, Dropshipping Direct and/or d.b.a., Ecom Authority, for free, with no compensation to Empire.

9.     Counterclaimants bring this action to recover damages for LCC's breach of the implied covenant of good faith and fair dealing underlying the purchase agreement, Cohen and Dropshipping Direct's intentional interference with the purchase agreement, including stripping Empire of assets and utilizing resources to create its own FBA program, and the harm that LCC and Cohen have caused to Counterclaimants as a result of LCC and Cohen's fraudulent and defamatory statements, among other things.

## **PARTIES**

10.     Defendant / Counterclaimant Roman Cresto is, and at all material times was, an individual domiciled in San Diego County, California.

11.     Defendant / Counterclaimant John Cresto is, and at all material times was, an individual domiciled in San Diego County, California.

12.     Defendant / Counterclaimant Stryder Holdings LLC is, and at all material times was, a California limited liability company with its principal place of business in San Diego County, California.  Stryder was the sole member of Empire until it was sold to LCC on or about November 11, 2022.  Roman and John are the only members of Stryder.

13.     Counterclaimants are informed and believe, and based thereon allege, that Plaintiff / Counterdefendant LCC Enterprises LLC is, and at all material times was, a Delaware limited liability company with its principal place of business in Broward County, Florida.

14.     Counterclaimants are informed and believe, and based thereon allege, that Plaintiff / Counterdefendant Daniel Cohen is, and at all material times was, an individual domiciled in the State of Florida.  Cohen is the sole member of LCC.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

15.     Counterclaimants are informed and believe, and based thereon allege, that Counterdefendant Dropshipping Direct LLC is, and at all material times was, a Wyoming limited liability company with its principal place of business in Broward County, Florida.  Counterclaimants are further informed and believe, and based thereon allege, that Cohen is the manager Dropshipping Direct and has a direct or indirect ownership interest Dropshipping Direct.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as (a) Counterclaimants are citizens of California; (b) Cohen is a citizen of Florida, LCC is a citizen of Delaware and Florida, and Dropshipping Direct is a citizen of Wyoming and Florida; and (c) the matter in controversy exceeds $75,000, exclusive of costs and interest.

17.     This Court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367(a) as Counterclaimants' claims are related to the claims alleged in the Complaint and the First Amended Complaint.

18.     This Court has personal jurisdiction over LCC and Cohen because they consented to the jurisdiction of this Court by filing their Complaint and First Amended Complaint in this action.  Additionally, this Court has personal jurisdiction over LCC as it consented to the exclusive jurisdiction of state and federal court in San Diego County, California for litigation arising out of the agreement that is the subject of this action.  (*See* Exh. A to Compl., Section 6.6.)  This Court has personal jurisdiction over Counterdefendant Dropshipping Direct as Counterclaimants are informed and believe that it does business in the State of California.

19.     Venue properly lies with this Court because (1) by filing their Complaint and First Amended Complaint, Cohen and LCC waived any venue objections; (2) LCC expressly consented to such venue (*see* Exh. A to Compl., Section 6.6); and (3) a substantial part of the acts or omissions giving rise to the claims at issue occurred within this judicial district (*see* 28 U.S.C. § 1391(b)(2).)

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

**GENERAL ALLEGATIONS**

**I.     The Crestos Grow Empire into a Successful E-Commerce Management Business**

20.     While pursuing a degree in engineering, Roman discovered dropshipping, a method of retail fulfillment for online businesses in which the business outsources the processes of procuring, storing, and shipping products to customers rather than warehousing its own inventory.  Driven by his curiosity, desire to create and innovate, and entrepreneurial spirit, Roman decided to open his first e-commerce dropshipping business on Amazon's platform in late 2018.  In connection with doing so, he founded Empire.

21.     Roman dedicated countless hours to growing his business and making it a success, including by meeting with and gaining insight from industry experts, and drawing on his knowledge of systems engineering to implement and test various strategies to automate his store.  After successfully managing his own e-commerce store and the stores of several friends and family members, Roman decided to start offering e-commerce automation management services to the public, through Empire.  In 2020, Empire started taking on clients, and Roman's cousin John joined the company.

22.     With Roman at the helm as CEO, Empire launched and managed hundreds of e-commerce stores on behalf of its clients.  Empire helped its clients build their e-commerce stores on a website (through platforms like Amazon or Walmart), populate the stores with products for sale, and run the stores, thereby enabling clients to earn passive income.  In exchange for a flat base fee and a percentage of the store's operating income, Empire took on the management of its clients' e-commerce stores, allowing them to bring in revenue without having to expend the time and acquire the skills necessary to launch, build, and manage their own store.  By implementing the strategies that had proven successful in connection with Roman's initial e-commerce

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

store, the Crestos were able to achieve impressive results for their clients, and grew Empire into a successful business that generated millions in revenue in 2020 and 2021.

23.    While Empire initially managed e-commerce businesses that exclusively used a dropshipping fulfillment model, it subsequently offered to manage e-commerce stores using the "Fulfilled by Amazon" ("FBA") model, in which business owners using Amazon's platform store their inventory in Amazon's fulfillment centers and outsource order fulfillment to Amazon.  Indeed, as time went by and Amazon's and Walmart's terms of service for their platforms changed and became increasingly more restrictive on dropshipping, the FBA model became more attractive to Empire and was starting to emerge as the preferred business model for those in the e-commerce industry.  Accordingly, in 2022, Empire undertook the months-long process of evaluating FBA as compared to dropshipping, which included, among other things, identifying and extensively vetting numerous FBA service providers.  This process culminated with Empire securing a contract with a particularly promising FBA provider and encouraging its clients to transition their stores from the dropshipping model to FBA.

## II.    Stryder Sells Empire to LCC and, Pursuant to the MIPA, Counterclaimants Maintain a Vested Interest in Empire's Continued Success

24.    After producing successful results for Empire and its clients, the Crestos realized that they had a lot to offer those who wanted to build other successful e-commerce management businesses.  Accordingly, in or around late 2021, Roman and John contemplated dedicating themselves to other ventures in the e-commerce space, namely, e-commerce business solutions—consisting primarily of the back-end components, ancillary services, and partnership resources that had allowed them to successfully build and scale Empire.

25.    Understanding it would be difficult to own and operate both Empire and their new business, Roman and John reluctantly made the decision to sell Empire in

or around mid-2022.  To ensure the continued success of Empire and its clients, the Crestos sought to find a buyer with e-commerce/dropshipping experience and who they believed could continue to scale Empire and service clients.  In or around October 2022, Roman got back in touch with Cohen—who, in Roman's understanding, had built Dropshipping Direct, a successful dropshipping/e-commerce business like Empire—to see if he would be interested in acquiring Empire from Stryder.  Cohen stated he was interested in the opportunity.

26.     In the weeks that followed, Cohen conducted due diligence on Empire, while the Crestos vetted Cohen to determine whether he did, in fact, have the experience and resources necessary to service Empire's clients and allow them and the company to thrive.  The Crestos became comfortable he did.  Cohen represented that he could manage Empire's dropshipping clients with his backend team already in use for dropshipping, and that he could continue facilitating a transition to the FBA model for clients that had elected to make the switch.  Among other things, Cohen claimed to have 10 years of experience operating dropshipping businesses and appeared to be knowledgeable regarding the industry.  Further, Cohen represented to the Crestos that, in addition to founding his own dropshipping automation company like Empire (specifically, Dropshipping Direct which, at the time, had been in business for 4+ years), he had previously successfully acquired two other dropshipping automation companies.

27.     Concurrent with the diligence process, Empire was working with its FBA service provider to transition many of its clients' stores from the dropshipping model to the more preferred FBA model.  Because of the industry-wide shift in preference to the FBA model, Counterclaimants knew that Empire's FBA service provider was a valuable asset that would be attractive to any prospective buyer—particularly a buyer like Cohen, who did not operate any stores employing the FBA model and did not have an FBA service provider.  Importantly, finding a suitable FBA provider was not simply a matter of conducting a Google search, and all FBA providers are not created

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

equal. Empire's FBA provider was unique in that it offered strong supplier relationships[1] and exceptionally favorable terms, including inventory buyback guarantees, both of which provided Empire an edge over its competitors.

28. During the diligence process, the Crestos informed Cohen that they had secured a coveted FBA provider and were in the process of transferring many of Empire's clients to the FBA model. Unsurprisingly, after learning what the FBA service provider could do for his business, including as a supplier for his dropshipping clients, Cohen expressed significant interest in Empire's FBA service provider and its unique offerings, including its supplier relationships. Although Cohen initially represented that he was "only [doing] 2 step dropshipping", that he was "not a fan" of the FBA model, and that he had not "looked into setting up FBA infrastructure yet", he soon expressed interest in using Empire's FBA provider in connection with the e-commerce stores he managed via his company Dropshipping Direct. In fact, Cohen quickly made clear that the future of Dropshipping Direct's business depended on gaining access to Empire's FBA provider and its unique offerings. At the time, Dropshipping Direct managed e-commerce stores operating under the 2-step dropshipping model for fulfillment, whereby each item purchased from a supplier like Walmart.com would be re-packaged and in some cases re-labeled, for example, with Amazon-branded tags, before being sent to the Amazon store customer. Cohen revealed to the Crestos that the over four hundred stores he managed under Dropshipping Direct were facing issues with fulfillment and that, as a result, he had put all those stores on "pause", meaning that they were not active and were not generating any sales. Cohen believed that Empire's FBA provider had the supplier relationships and resources to eliminate the fulfilment issues Dropshipping Direct had been experiencing in connection with its dropshipping stores, and that Empire's FBA

---

[1] Supplier relationships are a key component of the FBA model, as they allow companies like Empire to secure product for clients to ship into Amazon warehouses and fulfill orders on their stores. Supplier relationships are also key for the 2-step FBA model.

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

provider could remedy these issues, thereby allowing Dropshipping Direct to reactive its stores and resume generating sales.  Cohen was understandably eager to utilize Empire's FBA resource and stated that through the acquisition, he would "explode [the FBA provider's] business."  Accordingly, the Crestos knew that access to Empire's FBA service provider was a critical part of the deal for Cohen, so they refused to disclose the identity of the service provider until a deal was reached and the agreement signed.

29.     During the diligence process, Cohen also expressed interest in gaining access to Empire's aged Amazon account suppliers.[2]  As part of its services, Empire offered to provide and manage aged Amazon accounts for its clients and, over the years, Empire had found and cultivated relationships with several aged account suppliers that it used to source aged accounts for its clients.  By contrast, Cohen and his company Dropshipping Direct did not offer aged Amazon accounts and had no relationships with aged account suppliers, though he acknowledged he would need to help facilitate aged account acquisition and transition for Empire clients—both those who had aged accounts assigned to them and those in queue for aged accounts.  Cohen—who acknowledged he could charge clients more for aged accounts than new accounts—ostensibly saw the acquisition of Empire as an opportunity for Dropshipping Direct to quickly and easily transition to selling aged accounts and asked the Crestos to share the identity of Empire's aged account suppliers.  However, like its FBA service provider, Empire's aged account suppliers were valuable assets of the company and, accordingly, the Crestos refused to disclose the identity of Empire's aged account suppliers until the deal was closed.  Shortly after disclosing

_____

[2] In contrast to a new Amazon account (which has not sold any products), an "aged Amazon account" is a pre-existing Amazon account with a sales history and customer reviews.   Many in the e-commerce business considered aged Amazon accounts to be more desirable and less risky than new accounts, in part because their pre-existing rapport with Amazon oftentimes allowed them to be scaled faster.  Aged account suppliers have varying wait times depending on the account type and history they are sourcing.  The wait times can increase if the client has specified parameters it wants in their store.

the identity, Cohen went on to purchase multiple aged accounts from at least one supplier. Curiously, Cohen recently testified during a deposition in the ABC proceedings that he does not "do" or sell agent accounts because he considers them to be a "fraud". Further, when asked if aged accounts were a point of discussion with the Crestos in the communications leading up to the MIPA, Cohen testified that he "was never aware that [the Crestos] sold aged stores like this".

30.     On November 7, 2022, Roman, on behalf of Stryder and Empire, and Cohen, on behalf of LCC, executed a Membership Interest Purchase Agreement ("MIPA"), pursuant to which LCC purchased Stryder's interest in Empire. A true and correct copy of the MIPA is attached as Exhibit A to Plaintiffs' original Complaint, filed December 8, 2022, (Doc. No. 1), and is in incorporated by reference. Pursuant to its terms, the MIPA was to be effective as of November 11, 2022 (the "Effective Date"), and the closing of the sale would take place on the same date (the "Closing Date").

31.     In connection with the sale, LCC and Cohen promised and represented to the Crestos that they would continue to service Empire's clients and operate its business as a going concern. As part of this, LCC and Cohen also promised that they would continue the process of transitioning roughly 150 Empire clients from the dropshipping model to the FBA model, and cover the very low negotiated fees to do so. In exchange for Stryder's membership interests in Empire, LCC agreed to pay Stryder an upfront purchase price as provided in the MIPA, as well as 75% of the gross revenue collected from each of the accounts or e-commerce storefronts previously managed by Stryder for each calendar month for the first 12 consecutive months after the purchase. (*See* Exh. A to Compl., Sections 1.2.-1.3.) Though Counterclaimant's original asking price consisted of a larger upfront payment and a 50/50 revenue split, the compensation structure that was ultimately agreed to (with Stryder receiving a lower payment upfront and higher percentage of the revenue share) was a result of LCC and Cohen's insistence that Stryder have more "skin in the game",

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

and LCC and Cohen's promise to pay the roughly $150,000 in fees to Empire's FBA provider to launch the stores of approximately 150 Empire clients who were in the process of transitioning from dropshipping to the FBA business model. Empire locked in this competitive rate with its FBA provider and had already paid for transitioning a first set of approximately 20 Empire clients to the FBA model with said provider, prior to MIPA execution. Indeed, on November 14, 2022, Cohen confirmed at least eight Empire clients were underway with the transition process and had purchased inventory from the FBA provider.

32.    To ensure the success of Empire's clients and a smooth transition of Empire's business, John and Roman agreed to serve as advisors to LCC after the sale. (*See* Exh. A to Compl., Section 1.5.) The Crestos, through their new business entity, also entered into a separate agreement with LCC, whereby they would remain indefinitely involved in helping LCC generate business and work with contacts in the industry—an agreement that proved lucrative for both parties, even during the transition process.

### III.    Counterclaimants Uncover Counterdefendants' Fraudulent Scheme to Strip Empire of Its Most Valuable Assets for the Benefit of Dropshipping Direct

33.    While Counterclaimants reasonably believed that LCC and Cohen intended to operate Empire's business as a going concern and would continue to service Empire's clients, their belief was based on LCC and Cohen's false promises and concealment of their true intentions for Empire. Shortly after the Effective Date, it became apparent to Counterclaimants that Cohen and LCC had no intention of operating Empire's business as a going concern or servicing all of its clients, as they had led Counterclaimants to believe. Rather, based on the circumstances leading up to and immediately following the execution of the MIPA as alleged herein below, Counterclaimants are informed and believe that Cohen and LCC's true, undisclosed intention in purchasing Empire was to loot the company of its best and most valuable

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

assets—specifically, its FBA service provider, aged account suppliers, and Empire's top clients, among other assets—and use those assets to salvage Cohen's other company, Dropshipping Direct.

34.     As agreed, at or around the time the MIPA was executed, the Crestos disclosed to Cohen the identity of Empire's FBA service provider.  Thereafter, Cohen wasted no time attempting to forge a relationship with them, seemingly making this his top priority after signing the MIPA.  However, Cohen's purpose in establishing a relationship with Empire's FBA provider was not to facilitate the transition of *Empire's* clients' stores to the FBA provider, as he had promised the Crestos.  Rather, Cohen sought to immediately start using the FBA provider in connection with his other business, Dropshipping Direct, which does business under the name Ecom Authority and operates the Ecom Authority website, with Ecom Authority *only* offering FBA services.  Indeed, as alleged in Paragraph 28 above, Cohen was eager to utilize the FBA resource as he was relying upon it to resume the operations of *hundreds* of stores managed by Dropshipping Direct.  Additionally, Cohen was also relying on Empire's FBA provider to expand Dropshipping Direct's business offerings to include e-commerce stores employing the more preferable FBA model—something that, up until this point, it had not been able to offer.  Just after signing the MIPA, Cohen sought to transition Dropshipping Direct's clients to Empire's FBA provider and position them *ahead* of the 150+ Empire clients that still needed to be transitioned.  Counterclaimants are informed and believe that Dropshipping Direct had successfully started onboarding its clients with Empire's FBA provider within weeks of executing the MIPA.  Also within weeks of MIPA execution, Cohen stated that Dropshipping Direct—which did not have its own FBA service, let alone its own FBA provider, prior to the sale—would only be taking on new FBA clients.  Dropshipping Direct now appears to *only* run stores under the FBA model and further appears to run its FBA stores under the name Ecom Authority (https://www.ecomauthority.co/), with Dropshipping Direct's separate website now

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

appearing non-functional and/or disabled (https://www.dropshippingdirect.com/). Counterclaimants are informed and believe, and based thereon allege that Ecom Authority now uses Empire's FBA provider to manage most if not all its stores. Indeed, mere months after Cohen stated he was "not a fan" of the FBA model, Ecom Authority's website, which does not mention dropshipping and appears to *only* offer FBA, claims the company "is making STEADY & SERIOUS profits for over 1,000 partner stores . . . ."[3]

35.     Similarly, following the sale, Cohen immediately made use of Empire's aged account suppliers.  In fact, within a week of the Closing Date, Cohen purchased several aged accounts directly from at least one of Empire's aged account suppliers. Counterclaimants are informed and believe, and based thereon allege, that Cohen and Dropshipping Direct, d.b.a. Ecom Authority, use Empire's aged account suppliers to source aged accounts for Dropshipping Direct/Ecom Authority.  Indeed, a client review on the Ecom Authority website states, in part "My Store Was Aged So My Results Came Quickly".[4]   Again, despite immediately making use of Empire's aged account resource after the acquisition, Cohen recently testified during a deposition in the ABC proceedings that he does not "do" aged accounts and considers them to be "fraud".

36.     Counterclaimants are informed and believe, and based thereon allege, that after the sale, Cohen (on behalf of Dropshipping Direct) also began targeting certain Empire clients to convince them to transfer the management of their stores from Empire to Dropshipping Direct/Ecom Authority.  Cohen and Dropshipping Direct were able to successfully convince a number of Empire's clients to move the management of their stores to Dropshipping Direct, depriving both Empire and

---

[3]  See https://www.ecomauthority.co/#bulletproof

[4] A true and correct copy of a screenshot of the "Reviews & Testimonials" section of Ecom Authority's website, taken April 10, 2023, is attached hereto as **Exhibit 1**.

Stubbs Alderton & Markles, LLP
15260 Ventura Blvd.
20th Floor
Sherman Oaks, California 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

Counterclaimants of the revenue from those stores. Dropshipping Direct did not compensate Empire for this loss in revenue.

37.     While Counterdefendants were busy attempting to poach Empire's clients and forge relationships with Empire's FBA provider and aged account suppliers for the purpose of saving Dropshipping Direct's business, Cohen effectively torched Empire's business by, among other things, neglecting to service Empire's clients and their stores, including by making no effort to transition many of Empire's clients to its FBA provider, as he had promised.  At the same time, Cohen failed to respond to communications from Empire's clients and, against the advice of Roman and John, he terminated most of Empire's employees and contractors, despite the fact that there were hundreds of Empire clients to service and that Cohen had acknowledged Empire had a much better support system in place.  Cohen also failed to pay the few employees/contractors he decided to retain.  Unsurprisingly, client complaints rolled in.

38.     Rather than assist Empire's clients, Cohen used this as an opportunity to have his cake and eat it too.  Now that Counterdefendants had what they actually wanted—specifically, Empire's FBA provider, aged account suppliers, and other valuable assets—Cohen and LCC blamed the client complaints on the Crestos and tried to force them to rescind the MIPA so they could return their focus to Dropshipping Direct and avoid dealing with the consequences of their own actions. Counterclaimants declined to rescind the MIPA and take back the shell of a company that Cohen and LCC had left behind.

39.     When Counterclaimants refused to rescind the MIPA, Cohen resorted to his next best option: shutting down Empire's business and commencing an ABC. After absconding with Empire's FBA provider, aged account suppliers, clients, and other valuable assets, Cohen and LCC had no reason to keep operating Empire as a going concern.  As Cohen knew, many of the remaining Empire stores were suspended or on pause, just like he had experienced with Dropshipping Direct, and there was no

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

need for him to deal with these stores now that Dropshipping Direct/Ecom Authority was on track to thrive.  And, by initiating the ABC, Cohen could absolve himself of liability.  Accordingly, on or about November 29, 2022, just weeks after the parties executed the MIPA, Cohen shut Empire down and ceased its operations.  Not long thereafter, a petition commencing an assignment for the benefit of Empire's creditors was filed in Florida.

## IV.  LCC and Cohen Launch a Smear Campaign Against Counterclaimants and Falsely Blame Them for Their Decision to Discontinue Empire's Operations

40.    Ostensibly understanding that the news of Empire's closure would anger and upset Empire's clients, Cohen decided to blame his decision to shut down Empire on Roman and John.  In doing so, Cohen effectively launched a smear campaign against the Crestos, falsely painting them as liars, fraudsters, and incompetent business owners.

41.    On November 29, 2022, Cohen held a Zoom conference with Empire's clients, during which he announced that he was shutting down the company, effective immediately.  During the call, Cohen made numerous false statements regarding his reasons for abruptly shutting down the company.  Among other things, Cohen stated that (1) when he acquired Empire, "there were a bunch of material undisclosed liabilities that . . . would make it pretty near impossible for ongoing operations to stay conducting"; (2) he is "going to be shutting down the company because of the massive liabilities that came with it from the previous ownership"; (3) "the previous owners . . . won in this situation"; (4) the need to shut down Empire "is all really just something that was caused by the mismanagement from the prior ownership"; (5) "[he] bought a company that has an insane amount of liabilities"; and (6) that "this is what has to be done given the situation that was caused by the past ownership".  Cohen effectively encouraged Empire's clients to direct their ire at the Crestos, telling them that, if he were in their shoes, he would initiate legal action against Empire's previous

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

ownership. During the November 29 Zoom conference, Cohen also announced that he was in the process of working out a way to move Empire's remaining clients to his other e-commerce company (i.e., Dropshipping Direct), and directed certain of Empire's clients to contact him to discuss next steps.

42.    Counterclaimants are informed and believe, and based thereon allege, that during the week of the November 29 Zoom conference and in the several weeks that followed, Cohen further disparaged Counterclaimants by telling Empire's clients that Roman and John had engaged in fraud and other illegal conduct. In particular, on or about November 29, 2022, Roman spoke on the phone with Empire client Shaunik Raheja ("Raheja") who informed Roman that Cohen had told him that Roman and John had committed fraud. On or about the same day, Roman also had a separate telephone call with Empire client David Salib ("Salib"), during which Salib told Roman that Cohen had told him that Roman and John had committed fraud. Additionally, on or about November 28, 2022, Empire client Chad Johnson ("Johnson") informed John on a phone call that Cohen had told him that John and Roman had no interest in running stores on behalf of their clients, and instead just collected upfront base fees. During his call with Johnson, John also learned that Cohen was falsely representing to Empire's clients that the Crestos had some level of control or authority over Empire's clients' stores. Specifically, Johnson told John that Cohen had told him that "previous ownership" was responsible for sourcing the accounts necessary to run Johnson's e-commerce stores. Similarly, during a phone call between Roman and Empire client Ana Gregorio ("Gregorio") on or about December 15, 2022, Gregorio told Roman that she and many other Empire clients had been told that Roman and John's business model for Empire had been simply to collect the base fees paid by clients upfront, and that they had no intention of actually running clients' e-commerce stores. Roman and John are informed and believe that Cohen is the person that made such false statements to Gregorio and other Empire clients.

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

43.     Adding fuel to the fire, after his November 29 announcement that he would be shutting Empire down, Cohen continued to fail to respond to questions and communications from Empire's clients, causing further frustration and confusion, and leading to a number of Empire's clients contacting Roman and John about their stores. Again, this is exactly what Cohen had directed them to do.

44.     Counterclaimants are informed and believe, and based thereon allege, that Cohen also made disparaging remarks about Roman and John to Empire's former employees and independent contractors.  On or about November 29, 2022, Drew Kidwell ("Kidwell"), a former Empire contractor who had been terminated on the November 11, 2022 Closing Date, sent Roman a text message in which he stated that he had "just hopped off the phone with Dan" before asking "so you scammed the fuck out of Dan to try to get out of the shitshow with Empire?" and threatening to "doxx the fuck out of" Roman.[5]   A true and correct copy of a screenshot of Kidwell's November 29, 2022 text message to Roman is attached hereto as **Exhibit 2** and is incorporated by reference.

45.     On or about November 29, 2022, Roman and Kidwell spoke on the phone, and Kidwell admitted that he was trying to extort Roman for $20,000, and he further threatened to release Roman's personal information if Roman did not pay him $20,000.  Kidwell told Roman that he had talked to Cohen and, as a result, he "knew" that Counterclaimants had sold Empire to Cohen without disclosing the company's liabilities and that, because of this, Kidwell had decided to "fuck[] with [Roman] for money . . .."  Kidwell's coordinated threats have become so substantial that a police report has been filed, and law enforcement is now involved.

46.     Additionally, during the abovementioned phone call with Roman and in his November 29, 2022 text message, Kidwell identified the price LCC paid to

---

[5] The term "doxx" is defined as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge". (*Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/doxx.)

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

purchase Empire which, pursuant to Section 4.1 of the MIPA, was required to be kept confidential. Kidwell could have only obtained this information from Cohen.

## FIRST CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
### (Against Plaintiff/Counterdefendant LCC Enterprises LLC)

47.     Counterclaimants hereby incorporate by reference Paragraphs 1-46 of this Counterclaim as if set forth in full herein.

48.     On or about November 7, 2022, Roman, on behalf of Empire and Stryder, and Cohen, on behalf of LCC, executed the MIPA. Pursuant to the MIPA (which had a November 11, 2022 Effective Date and Closing Date), LCC purchased Stryder's interest in Empire.

49.     The MIPA is subject to the implied covenant of good faith and fair dealing, requiring that LCC act in good faith at all times in the performance of its obligations under the MIPA.

50.     Section 1.3(b) of the MIPA provides, in part, that "[LCC] shall pay to [Stryder], with respect to each Calculation Period, seventy-five percent (75%) of the gross revenue collected from each of [Stryder's] Stores, i.e., the monthly management profit split, (the 'Store Revenue Split') for such Calculation Period (each, a 'Store Revenue Split Payment')." (Exh. A to Compl., MIPA 1.3(b).) "Store" is defined as "an account or e-commerce storefront, previously managed by [Stryder]". (*Id*.) "Calculation Period" is defined as "each calendar month forth the first 12 consecutive months." (Exh. A to Compl., MIPA, Section 1.3(a)(i).)

51.     Stryder has performed all, or substantially all, of the material obligations as required under the MIPA, except for those obligations excused by the acts and omissions of LCC.

52.     Just weeks after the parties executed the MIPA, Cohen and LCC terminated Empire's operations. During a November 29, 2022 Zoom conference,

Cohen announced to Empire's clients that he would be shutting down Empire's business, effective immediately. Cohen also announced that he intended to move some of Empire's clients over to his other dropshipping/e-commerce company (i.e., Dropshipping Direct). Stryder is informed and believes, and on that basis alleges, that Cohen and LCC did in fact move the management of a number of Empire's clients' stores to Dropshipping Direct and/or its d.b.a. Ecom Authority.

53. By shutting Empire down, refusing to manage Empire's clients' stores, and moving some of Empire's clients to Cohen's other e-commerce business, Dropshipping Direct, d.b.a. Ecom Authority, LCC has prevented Stryder from receiving the benefits it was promised under the MIPA. Specifically, LCC has deprived Stryder of receiving the Store Revenue Split Payments it was promised pursuant to Section 1.3(b) of the MIPA since, as a result of its abovementioned actions, LCC will not collect *any* revenue from the e-commerce storefronts Stryder previously managed as Empire's owner. Critically, the Store Revenue Split Payments were intended to make up a large portion of the compensation Stryder was to receive in connection with the sale of Empire to LCC, and *Cohen and LCC* had been the ones to insist Stryder take less money upfront and receive a greater percentage of Empire's revenues. Stryder would not have agreed to this compensation structure if it had known there would be no revenue collected from Empire's stores or that LCC would move certain of Empire's clients to Dropshipping Direct, enabling Cohen (via Dropshipping Direct) to collect revenues from the stores of those former Empire clients while denying Stryder its revenue split. Accordingly, in acting as herein alleged, LCC failed to act fairly and in good faith, in breach of the implied covenant of good faith and fair dealing.

54. As a direct and proximate result of LCC's breach of the implied covenant of good faith and fair dealing, Stryder has suffered damages in an amount no less than $2,000,000, to be proved at trial.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

**SECOND CAUSE OF ACTION**

**DEFAMATION**

**(Against Plaintiff/Counterdefendants LCC Enterprises LLC and Daniel Cohen)**

55.     Counterclaimants hereby incorporate by reference Paragraphs 1-46 of this Counterclaim as if set forth in full herein.

56.     Counterclaimants are informed and believe, and based thereon allege, that in or around the late-November to mid-December 2022 time period, Cohen and LCC disparaged Counterclaimants by falsely stating to Empire's clients that Roman and John had committed fraud, that Roman and John were running a scam/sham operation, that they had no intention of running Empire's clients' stores, and that their business model was simply to collect the base fees paid by clients upfront and not run clients' stores.  In particular, on or about November 29, 2022, Roman spoke on the phone with Empire client's Raheja and Salib who each separately told Roman that Cohen had said Roman and John had committed fraud.  Additionally, on or about November 28, 2022, Empire client Johnson informed John that Cohen had told him that John and Roman had no interest in running stores on behalf of their clients, and instead just collected upfront the base fees.  Similarly, during a phone call between Roman and Empire client Gregorio on or about December 15, 2022, Gregorio told Roman that she and many other Empire clients had been told that Roman and John's business model for Empire had been simply to collect the base fees paid by clients upfront, and that they had no intention of actually running clients' e-commerce stores.

57.     Counterclaimants are further informed and believe, and based thereon allege, that in or around the late-November 2022 time period, Cohen also made disparaging remarks about Roman and John to Empire's former employees and independent contractors that were of the same nature and substance as those alleged above. On or about November 29, 2022, Kidwell, a former Empire contractor, sent Roman a text message in which he stated that he had "just hopped off the phone with Dan" before asking "so you scammed the fuck out of Dan to try to get out of the

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

shitshow with Empire?" and threatening to "doxx the fuck out of" Roman. Roman and Kidwell later spoke on the phone, and Kidwell admitted that he was trying to extort Roman for $20,000. Kidwell also told Roman that he had talked to Cohen and, as a result, he "knew" that Counterclaimants had sold Empire to Cohen without disclosing the company's liabilities and that, because of this, Kidwell had decided to "fuck[] with [Roman] for money . . .."

58. The statements alleged herein were made of and concerning Counterclaimants, and those who heard the statements reasonably understood that they were about Counterclaimants.

59. The statements alleged herein are false and not privileged.

60. Cohen and LCC published the above statements knowing they were false, or with reckless disregard as to their truth or falsity.

61. Those who heard the statements reasonably understood them to mean that Counterclaimants had engaged in criminal or unlawful conduct and unethical/unlawful business practices in connection with their operation of Empire— or, at the very least, that Counterclaimants were woefully incompetent in their operation of Empire—thereby injuring Counterclaimants in their business, profession, and trade, damaging their personal and professional reputations, and exposing them to hatred and contempt. Indeed, during the late-November to mid-December 2022 time period, Roman and John received a barrage of angry messages from Empire clients, including messages stating the following: (1) "Mother fucker scammer. You will not get away with this. Watch your back."; (2) "Roman Cresto, you are going to get the hammer thrown down on you hard. Tread lightly"; (3) "you aren't gonna see your kids grow up because you will be in prison you scum bag piece of shit"; (4) "You guys are a fucking SCAM! You stole my $55k then sold ur BS company to a BS buyer and are now putting all the blame on him. Well guess what, its just a matter of time before KARMA catches up to you. You just wait. ITS COMING."; and (5) "Just so

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

you know mother fucker... I'm contacting the FBI tomorrow and letting them know how I'm dealing with you…".

62.     As a direct and proximate result of Cohen and LCC's publication of the above-alleged false and defamatory statements, Counterclaimants have suffered and continue to suffer damages including but not limited to lost revenue, loss of their personal and professional reputations, and increased costs in their professions, business, and trade.

63.     Cohen and LCC, in acting as hereinabove alleged, acted with malice and oppression insofar as they defamed Counterclaimants.  Counterclaimants are therefore entitled to an award of exemplary and punitive damages in an amount according to proof.

## THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against Plaintiff/Counterdefendant LCC Enterprises LLC)

64.     Counterclaimants hereby incorporate by reference Paragraphs 1-46 of this Counterclaim as if set forth in full herein.

65.     On or about November 7, 2022, Roman, on behalf of Empire and Stryder, and Cohen, on behalf of LCC, executed the MIPA.  The MIPA became effective November 11, 2022.

66.     Section 4.1 of the MIPA provides that "[e]ach Party will keep confidential the terms of this Agreement, provided that each Party may disclose such matters to such Party's spouse, and persons such Party may retain as legal counsel, tax preparers, accountants, and financial advisors, only if such third parties agree to keep the terms of this Agreement confidential or are otherwise bound to professional obligations to keep such matters confidential."

67.     Stryder has performed all, or substantially all, of the significant obligations as required under the MIPA, except for those obligations excused by the acts and omissions of LCC.

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

68.     Counterclaimants are informed and believe, and based thereon allege, that LCC has disclosed terms of the MIPA, including the purchase price, to third parties, in breach of Section 4.1 of the MIPA.  Since the execution of the MIPA, multiple individuals have indicated to Roman that they are aware of the amount of money LCC paid to purchase Empire.  Counterclaimants did not disclose the purchase price to any of these individuals.  Counterclaimants are further informed and believe that LCC has disclosed the purchase price to third parties on multiple occasions.

69.     As a direct and proximate result of LCC's breach of Section 4.1 of the MIPA, Stryder has suffered damages in an amount according to proof.  Pursuant to Section 5.3 of the MIPA, Stryder also seeks recovery of its attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

## (Against Plaintiff/Counterdefendant Daniel Cohen and Counterdefendant Dropshipping Direct LLC)

70.     Counterclaimants hereby incorporate by reference Paragraphs 1-46 of this Counterclaim as if set forth in full herein.

71.     On or about November 7, 2022, Roman, on behalf of Empire and Stryder, and Cohen, on behalf of LCC, executed the MIPA.  The MIPA became effective November 11, 2022.

72.     Cohen and Dropshipping Direct knew of the MIPA and its terms as Cohen, the manager of Dropshipping Direct, signed the MIPA on behalf of LCC in his capacity as LCC's "owner".

73.     Cohen and Dropshipping Direct's conduct prevented performance of the MIPA.  In particular, Counterclaimants are informed and believe, and based thereon allege, that Cohen and Dropshipping Direct facilitated the transfer of the management of a number of Empire's clients' stores from Empire to Dropshipping Direct.  Indeed, during the November 29, 2022 Zoom conference, Cohen announced that he intended to move some of Empire's clients over to his other dropshipping/e-commerce

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

company (i.e., Dropshipping Direct) and directed Empire clients with active FBA stores to email him regarding next steps.

74.   By transferring the management of Empire's clients' stores from Empire to Dropshipping Direct, Cohen and Dropshipping Direct intended to disrupt the performance of the MIPA and knew that disruption of performance was substantially certain to occur.  More specifically, by transferring the management of Empire's clients' stores to Dropshipping Direct, Cohen and Dropshipping Direct knew and understood that Empire (and LCC as Empire's owner) would no longer be collecting revenue from those stores.  Accordingly, Cohen and Dropshipping Direct knew that they would be depriving Stryder of its 75% share of the gross revenue collected from those stores, which LCC was obligated to provide Stryder under Section 1.3(b) of the MIPA.

75.   As a direct and proximate result of Cohen and Dropshipping Direct's actions as alleged hereinabove, Stryder has been damaged in an amount according to proof.

76.   At all material times, Cohen and Dropshipping Direct, in acting as hereinabove alleged, acted with malice and oppression insofar as they intentionally and knowingly interfered with the MIPA.  Stryder is therefore entitled to an award of exemplary and punitive damages in an amount according to proof.

## FIFTH CAUSE OF ACTION

### PROMISSORY FRAUD

**(Against Plaintiff/Counterdefendants Daniel Cohen and LCC Enterprises LLC)**

77.   Counterclaimants hereby incorporate by reference Paragraphs 1-46 of this Counterclaim as if set forth in full herein.

78.   Cohen and LCC promised and represented to Counterclaimants that after purchasing Empire, they would continue to service Empire's clients and operate its business as a going concern for at least the year following the sale.  Indeed, under Section 1.3(b) of the MIPA, LCC promised to pay Stryder "with respect to each

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

Calculation Period, seventy-five percent (75%) of the gross revenue collected from each of [Stryder's] Stores, i.e., the monthly management profit split, (the 'Store Revenue Split') for such Calculation Period (each, a 'Store Revenue Split Payment')." "Store" is defined as "an account or e-commerce storefront, previously managed by [Stryder]". "Calculation Period" is defined as "each calendar month forth the first 12 consecutive months." (Exh. A, MIPA, Section 1.3(a)(i).) Further, in the negotiations leading up to the execution of the MIPA, Cohen advocated for this compensation structure (with Stryder receiving a lower upfront payment and higher revenue split) because he wanted Counterclaimants to have more "skin in the game" and demonstrate they believed in good faith that Empire's clients' stores would be successful. Counterclaimants indicated they would agree to a lower upfront purchase price and higher share of gross profits if Cohen/LCC covered the fees associated with transitioning a number of Empire's clients to the FBA model. Cohen agreed and represented that he and LCC would cover the fees and transition the clients.

79.    Counterclaimants are informed and believe, and on that basis allege, that Cohen and LCC had no intention of performing their promise at the time it was made.

80.    Counterclaimants are informed and believe, and on that basis allege, LCC and Cohen made the promises alleged herein with the intent of inducing Counterclaimants into selling Empire to LCC, entering into the MIPA, and disclosing Empire's FBA provider and several aged account suppliers, so that they could loot Empire of its most valuable assets to save the business of Dropshipping Direct.

81.    Counterclaimants justifiably and reasonably relied on LCC and Cohen's promises in deciding to sell Empire to LCC, entering into the MIPA, and accepting a lower upfront purchase price for Stryder's membership interest in Empire. Had Counterclaimants known LCC and Cohen had no intention of keeping their promise to service Empire's clients, transition clients to the FBA provider, and operate Empire as a going concern, Counterclaimants would not have agreed to sell Empire to LCC and enter into the MIPA. Indeed, Counterclaimants would have **continued** to pay the

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

FBA transfer fees themselves, and would have continued to run Empire's clients' stores until they found appropriate alternatives to Cohen and LCC.

82. LCC and Cohen failed to perform as promised. Just weeks after purchasing Empire and gaining access to its FBA provider, Cohen announced that he was shutting down Empire. Shortly thereafter, Empire filed a petition commencing an assignment for the benefit of creditors in Florida.

83. As a direct and proximate result of LCC and Cohen's false promises, Counterclaimants have suffered damages in an amount to be proven at trial, in an amount no less than $2,000,000. Additionally, Counterclaimants seek reliance damages in the form of costs and expenses incurred in connection with negotiating and entering into the MIPA.

84. Cohen and LCC acted in a manner which was fraudulent, malicious, despicable, and constituted a gross and conscious disregard for Counterclaimants' rights, such that an award of punitive or exemplary damages against Cohen and LCC is justified. The amount of said damages will be proven at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE Counterclaimants Roman Cresto, John Cresto, and Stryder Holdings LLC pray for judgment against Counterdefendants Daniel Cohen, LCC Enterprises LLC, and Dropshipping Direct LLC as follows:

FIRST CAUSE OF ACTION

1. For an award of damages in an amount no less than $2,000,000, to be proven at trial;

SECOND CAUSE OF ACTION

2. For an award of damages in an amount no less than $100,000, to be proven at trial, including but not limited to loss of reputation and lost profit damages;

3. For an award of punitive and exemplary damages in an amount according to proof;

STUBBS ALDERTON & MARKLES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM

THIRD CAUSE OF ACTION

    4.  For an award of damages in an amount according to proof;

    5.  For attorneys' fees and costs, pursuant to Section 5.3 of the MIPA;

FOURTH CAUSE OF ACTION

    6.  For an award of damages in an amount according to proof;

    7.  For an award of punitive and exemplary damages in an amount according to proof;

FIFTH CAUSE OF ACTION

    8.  For an award of damages in an amount no less than $2,000,000, to be proven at trial;

    9.  For an award of punitive and exemplary damages in an amount according to proof;

ALL CAUSES OF ACTION

    10.For prejudgment interest, accruing at the maximum legal rate;

    11.For costs of suit incurred herein; and

    12.For other such relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Counterclaimants demand a trial by jury of all issues raised by the pleadings which are so triable.

Dated:  April 18, 2023         **STUBBS ALDERTON & MARKILES, LLP**

By: */s/ Daniel A. Rozansky*
Daniel A. Rozansky
John R. De La Merced
Blaine A. O'Malley

Attorneys for Defendants / Counterclaimants
Plaintiffs Roman Cresto, John Cresto and
Stryder Holdings LLC

STUBBS ALDERTON & MARKILES, LLP
15260 VENTURA BLVD.
20TH FLOOR
SHERMAN OAKS, CALIFORNIA 91403

DEFENDANTS/COUNTERCLAIMANTS' ANSWER TO FIRST AMENDED COMPLAINT
AND FIRST AMENDED COUNTERCLAIM