1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  LCC ENTERPRISES LLC, a Delaware          Case No.:  22cv1944 DMS(BGS)
    limited liability company, and DANIEL
12  COHEN, an individual,                    **ORDER GRANTING PLAINTIFFS'**
                                             **MOTION TO DISQUALIFY**
13                            Plaintiffs,    **DEFENDANTS' COUNSEL STUBBS**
                                             **ALDERTON & MARKILES, LLP**
14  v.

15  ROMAN CRESTO, an individual, JOHN
16  CRESTO, an individual, and STRYDER
    HOLDINGS LLC, a California limited
17  liability company,

18                            Defendants.

19  ROMAN CRESTO, an individual, JOHN
20  CRESTO, an individual, and STRYDER
    HOLDINGS LLC, a California limited
21  liability company,

22                       Counter Claimants,

23  v.

24  LCC ENTERPRISES LLC, a Delaware
25  Limited liability company, DANIEL
    COHEN, an individual, and
26  DROPSHIPPING DIRECT LLC, a
    Wyoming limited liability company,
27
28                     Counter Defendants.

                                    1

This matter comes before the Court on Plaintiffs' motion to disqualify Defendants' counsel Stubbs Alderton & Markiles, LLP for violation of the California Rules of Professional Conduct. Defendants Roman Cresto, John Cresto, and Stryder Holdings LLC filed an opposition to the motion, and Plaintiffs filed a reply. The parties also filed a joint motion to allow the filing of additional evidence on the motion, which the Court granted. After thoroughly considering the parties' briefs, the relevant legal authority, and the record, the Court grants the motion.

## I.

## BACKGROUND

This case involves the sale of Empire Ecommerce LLC and its subsidiary Onyx Distribution LLC. Empire was founded by Roman Cresto for the purpose of "offering e-commerce automation management services to the public[.]" (Decl. of Roman Cresto in Supp. of Opp'n to Mot. ("Roman Decl.") ¶2.) After its founding, Empire was owned by Stryder Holdings LLC, which was owned by Roman and John Cresto. In November of 2022, the Crestos sold Empire to LCC Enterprises LLC, which is owned by Daniel Cohen. After the sale, Cohen learned that Empire had numerous liabilities which were not disclosed prior to the sale. Cohen and LCC thereafter filed the present case against the Crestos and Stryder alleging claims for fraud in the inducement, negligent misrepresentation, breach of contract, and violations of California Business and Professions Code § 17200.[1] In response, the Crestos and Stryder filed an Answer and Counterclaim against LCC, Cohen, and Dropshipping Direct LLC alleging claims for breach of the implied covenant of good faith and fair dealing, defamation, breach of contract, intentional interference with contractual relations, and promissory fraud.

The present motion concerns Stubbs Alderton & Markiles, LLP ("SAM"), the law firm representing Defendants in this case. SAM's involvement with the parties began in

---

[1] In their original Complaint, Cohen and LCC also alleged a claim for defamation, but that claim was withdrawn from the First Amended Complaint.

22cv1944 DMS(BGS)

August 2021, when Roman Cresto engaged the firm to represent Empire. Daniel Rozansky, a partner at SAM and counsel for Defendants in this case, states SAM's initial role as counsel for Empire was to provide support to Empire's general counsel on "general corporate matters on an as-needed basis depending on what issues may have arisen or affected the company." (Decl. of Daniel Rozansky in Supp. of Opp'n to Mot. ("Rozansky Decl.") ¶7.) In this role, "SAM prepared certain form agreements to be used in connection with Empire's business, including a form service agreement and nondisclosure agreement." (*Id.*) Empire then "started to utilize SAM's litigation services in connection with a limited number of demand letters that the company received and sending two demand letters to third parties." (*Id.* ¶8.) In September of 2022, the Crestos were looking to sell Empire, and two attorneys from SAM's Mergers & Acquisitions practice group assisted Empire's general counsel "in preparing certain acquisition documents." (*Id.* ¶13.) Ultimately, that sale fell through. (*Id.* ¶14.)

The following month, October of 2022, Roman Cresto identified Cohen as a potential buyer for Empire. (Roman Decl. ¶12.) On November 11, 2022, Roman, on behalf of Stryder, and Cohen, on behalf of LCC, executed a Membership Interest Purchase Agreement ("MIPA") by which Stryder sold its membership interests in Empire to LCC. (Compl., Ex. A, ECF 1-2.) Roman and Cohen both state that although the effective date of the MIPA was November 11, 2022, they executed the agreement on November 7, 2022. (Decl. of Daniel Cohen in Supp. of Mot. ("Cohen Decl.") ¶2; Roman Decl. ¶13.)

The following day, November 8, 2022, Jacob Faust of Empire sent an email to Mr. Rozansky informing him of the sale, and asking him to prepare a "matter list/synopsis" of Empire's cases. (Rozansky Decl., Ex. C.) Mr. Rozansky forwarded Faust's request to Blaine O'Malley, an associate at SAM, who prepared an Open Matters Memo ("the Memo") for Faust later that same day. (Rozansky Decl. ¶16; Decl. of Blaine O'Malley in Supp. of Opp'n to Mot. ("O'Malley Decl.") ¶8; Cohen Decl., Ex. 1.)

The following day, November 9, 2022, Roman forwarded the Memo to Cohen as part of a folder entitled, "Dan Cohen Integration Folder." (Cohen Decl. ¶3.) Cohen

declares that before he reviewed the Memo, he was unaware that Empire, Onyx and SAM were dealing with the legal matters outlined in the Memo.  (*Id.* ¶4.)  Cohen states that after he read the Memo:

> I told the Crestos that they never told me about these Open Matters before or around the time when I purchased the Companies [Empire and Onyx].  In response, the Crestos said the matters were not lawsuits, and that they would set up a call with the Companies' lawyers at SAM to confirm what the Crestos were saying to me.

(*Id.* ¶5.)  Later that day, Roman sent an email introducing Mr. Rozansky and Ms. O'Malley to Cohen.  (Rozansky Decl., Ex. D.)  Cohen requested a meeting with the SAM attorneys, which was scheduled for November 14, 2022.  (Cohen Decl., Ex. 2.)

During that meeting, which was held via Zoom, Mr. Rozansky and Ms. O'Malley "advised Mr. Cohen that SAM represented Empire and provided Mr. Cohen an overview of the legal matters [they] were presently working on for Empire at that time."  (Rozansky Decl. ¶18.)  Mr. Cohen states he then "formally engaged SAM, on behalf of the Companies, to be my lawyers."  (Cohen Decl. ¶7.[2])

Following the November 14 meeting, Cohen worked with Ms. O'Malley and Mr. Rozansky on the Rodriguez Matter, which was listed in the Memo.  (Cohen Decl., Ex. 3.)  During those conversations, Ms. O'Malley notified Cohen that depending on their chosen course of action she may need to reach out to the Crestos, and she asked Cohen if he would reach out to them to gauge their willingness to talk with her about the Rodriguez Matter.  (*Id.*)  Cohen did so, and the Crestos agreed to talk with Ms. O'Malley.  (*Id.*)

After making those arrangements, Cohen reached out to a number of Empire's clients introducing himself as the new owner of Empire.  (Cohen Decl. ¶9.)  Cohen states: "In response to these e-mails, I received as many as 25 complaints from these customers,

---

[2] Defendants object to this statement on grounds of lack of foundation, improper opinion, requirement of original.  The Court sets forth the statement here, but does not rely on it in reaching its decision.  Accordingly, the Court overrules Defendants' objections as moot.

22cv1944 DMS(BGS)

concerned about the state of their online stores, and most of them complaining about how they were waiting on stores that were never delivered." (*Id.*[3]; *see also* Cohen Decl., Ex. 4.)

On November 23, 2022, Cohen "called Roman Cresto and told him [he] wanted to rescind the transaction based on [Roman and John's] material misrepresentations and omissions about the liabilities and financial status of the Companies." (Cohen Decl. ¶11.[4]) Cohen states, "The Crestos ultimately refused to admit they did anything wrong and refused to rescind the transaction." (*Id.*) After that conversation, Cohen decided that he wanted to pursue legal action against the Crestos. (*Id.*)

Emails dated November 23, 2022, between Ms. O'Malley, Roman, and Cohen reflect that Ms. O'Malley was scheduled to talk with Roman about the Rodriguez Matter at noon that day. (Rozansky Decl., Ex. F.) It is unclear whether that conversation took place.

Ms. O'Malley states she did call Cohen that day to discuss one of the Open Matters, and that during that call Cohen asked her to confirm that SAM "represented Empire rather than Roman or John as individuals." (O'Malley Decl. ¶12.) Ms. O'Malley confirmed that was correct. (*Id.*) According to Ms. O'Malley:

> Mr. Cohen then informed me that he believed that John and Roman had committed fraud in connection with the sale of Empire to LCC, and that he was speaking with an attorney and considering pursuing legal action against the Crestos. Mr. Cohen advised me that he had informed Roman that he was considering pursuing legal action against him and John, and that, in response, Roman advised Mr. Cohen to contact Roman's lawyers at SAM. Mr. Cohen explained to me that this is what prompted him to seek clarity from me

---

[3] Defendants object to this statement on grounds of hearsay. The Court overrules this objection as Mr. Cohen is simply explaining how Empire's customers responded to his emails.

[4] Defendants object to this statement on grounds of lack of foundation and improper opinion. The Court overrules these objections as Mr. Cohen clearly has a foundation for his own statements, and the Court does not rely on his opinion that the Crestos made material misrepresentations to him about Empire.

regarding who SAM represented.  Mr. Cohen then asked me to confirm again that Mr. Rozansky and I represented Empire and not Roman, the individual.  I again advised Mr. Cohen that he was correct and stated that I found Roman's purported comment to be 'interesting' (or words to that effect).  I told Mr. Cohen that I would speak with Mr. Rozansky and then concluded the call.

(*Id.*)  Mr. Rozansky states Ms. O'Malley's representations to Cohen were correct, "that as of November 23, 2022, SAM had not been personally engaged by Roman—nor was it engaged by John or Stryder—but was solely engaged by Empire."  (Rozansky Decl. ¶21.)

Sometime between November 23 and November 30, however, things changed.  The exact timing of these events is unclear, but on November 30, Roman and John signed a written engagement agreement with SAM to represent them "in connection with the dispute with Mr. Cohen."  (Roman Decl. ¶21.)  That same day, Mr. Rozansky sent a letter to Cohen notifying him that SAM was terminating its representation of Empire.  (Cohen Decl., Ex 5.)  That letter states, "pursuant to the California Rules of Professional Conduct, Rule 1.16(b), we hereby withdraw as legal counsel for Empire Ecommerce LLC ('Empire') and Onyx Distribution LLC ('Onyx').  Effective immediately, we will no longer be representing Empire or Onyx in connection with any legal matters."  (*Id.*)

## II.

## DISCUSSION

As stated above, Plaintiffs move to disqualify SAM from further representing Defendants in this case on the ground that SAM violated the California Rules of Professional Conduct.  Specifically, Plaintiffs assert SAM's representation of Defendants is directly adverse to its former representation of Empire in violation of California Rules of Professional Conduct 1.6 and 1.7, and former California Rule of Professional Conduct 3-310.[5]  Defendants assert Plaintiffs do not have standing to bring the present motion, and they dispute that SAM is in violation of any ethical rules.

_____

[5] California Rule of Professional Conduct 3-310 was in effect until October 31, 2018, and has since been incorporated into Rules 1.7, 1.8.6, 1.8.7, and 1.9.

6

**A.     Standing**

Before turning to the question of whether SAM should be disqualified from further representing Defendants in this case, the Court first considers the standing issue.  Although Defendants cite cases supporting their argument that there is a standing requirement for disqualification motions, (*see* Opp'n to Mot. at 15-16) (citing *Coyler v. Smith*, 50 F.Supp.2d 966 (C.D. Cal. 1999); *Moreci v. Scaffold Solutions, Inc.*, 70 Cal. App. 5th 425, 442 (2021)), the issue appears unsettled.  *See Greenfield MHP Associates, L.P. v. Ametek, Inc.*, No. 3:15-cv-01525-GPC-AGS, 2018 WL 538961, at *2-5 (S.D. Cal. Jan. 24, 2018) (concluding "that Article III does not prevent the Court from entertaining and deciding a motion to disqualify counsel."); *see also Ballew v. City of Pasadena*, No. CV 18-0712 FMO(ASx), 2020 WL 4919384 (C.D. Cal. April 13, 2020) (following *Greenfield*); *Del Thibodeau v. ADT Security Services*, No. 3:16-cv-02680-GPC-AGS, 2018 WL 2684254 (S.D. Cal. June 5, 2018) (same).[6]  In *Greenfield*, the court reasoned that it makes little sense to apply a standing requirement to motions to disqualify because the court "possesses an inherent power to disqualify attorneys appearing before it."  2018 WL 538961, at *3.[7]  This Court finds the reasoning of *Greenfield* persuasive, and adopts it here to reach the same conclusion, namely, that "in the absence of controlling Supreme Court or Ninth Circuit case law stating the contrary, … Article III does not prevent the Court from entertaining and deciding a motion to disqualify counsel."  *Id.* at *5.  The Court proceeds to the merits below.

///

---

[6] Defendants concede "[t]he issue of standing on a disqualification motion brought in federal court is one of federal law."  (Opp'n to Mot. at 15 n.5.)

[7] California courts also recognize the court's inherent authority in this area.  *See Jessen v. Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 705 (2003) (quoting California Code of Civil Procedure § 128(a)(5)) ("A trial court's authority to disqualify an attorney derives from the court's inherent power to 'control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.'")

**B.      Disqualification**

Despite the parties' dispute over what ethical rules apply to this motion, there is no dispute the facts call for application of the "substantial relationship" test. This test applies to cases of successive representation, *i.e.*, "where the attorney successively represents clients with potential or actual adverse interests[.]" *Jessen*, 111 Cal. App. 4th at 705. The test

> mediates between two interests that are in tension in such a context—the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation, on the other.

*Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994). The parameters of the test are not firmly defined, but the test itself "is broad and not limited to the 'strict facts, claims, and issues involved in a particular action.'" *Knight v. Ferguson*, 149 Cal. App. 4th 1207, 1213 (2007) (quoting *Jessen*, 111 Cal. App. 4th at 711).

In applying the "substantial relationship" test, the first step for the Court is to determine "where the attorney's former representation placed the attorney with respect to the prior client." *Jessen*, 111 Cal. App. 4th at 710. In other words, did the attorney have a "direct and personal" relationship with the prior client, or was the relationship "peripheral and attenuated?" *Id.* at 710-11.

> If the relationship between the attorney and the former client is shown to have been direct—that is, where the lawyer was personally involved in providing legal advice and services to the former client—then it must be presumed that confidential information has passed to the attorney and there cannot be any delving into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not receive confidential information during the course of that relationship.

*Id.* at 709.

> On the other hand, where the former attorney-client relationship is peripheral or attenuated instead of direct, then the presumption will not be applied in the absence of an adequate showing that the attorney was in a position vis-à-vis

the client to likely have acquired confidential information material to the current representation.

*Id.* at 710.

In this case, neither side addressed this first step of the "substantial relationship" test, but it is clear to the Court that SAM had a direct and personal relationship with Empire during both the Crestos' operation of Empire and after Plaintiffs' acquisition of Empire. As Mr. Rozansky states in his Declaration, "SAM's initial scope of work was limited to providing general corporate, intellectual property and transactional legal advice to Empire." (Rozansky Decl. ¶6.) However, Empire thereafter "utilize[d] SAM's litigation services in connection with a limited number of demand letters that the company received and sending two demand letters to third parties." (*Id.* ¶8.) SAM also "provided additional litigation services to Empire" related to another one of its former customers, Daanish Azim. (*Id.* ¶11.) On that matter, "SAM initiated and prevailed in arbitration proceedings against Mr. Azim, … who was found to have breached a prior settlement agreement." (*Id.*) SAM also prepared acquisition documents for Empire in connection with a potential sale of the company, (*id.* ¶13), and provided services to Empire concerning the negotiations surrounding that sale. (*Id.* ¶14.) After Plaintiffs purchased Empire from the Crestos, SAM also prepared the Open Matters Memo at the request of an Empire employee but for the benefit of Plaintiffs. (*Id.* ¶15.) Thereafter, SAM brought Mr. Cohen "up to speed regarding the status of SAM's open legal matters for Empire." (*Id.* ¶18.) Mr. Cohen thereafter consulted with SAM about "what Empire should do as it related to the Open Matters." (O'Malley Decl. ¶11.) Given the direct and personal relationship between Empire and SAM, the first step of the "substantial relationship" test weighs "in favor of disqualification and the only remaining question is whether there is a connection between the two successive representations, a study that may not include an 'inquiry into the actual state of the lawyer's knowledge' acquired during the lawyers' representation of the former client." *Jessen*, 111 Cal. App. 4th at 711 (citations omitted). *See also Fiduciary Trust Int'l of Cal. v. Superior Court*, 218 Cal. App. 4th 465, 479 (2013) ("If the representation was 'direct—

that is, where the lawyer was personally involved in providing legal advice and services to the client' the only question is whether there is a substantial relationship between the subject of the prior representation and the subject of the current representation.")

In *Jessen*, the court stated there was a connection between two successive representations, *i.e.*, a "substantial relationship," "whenever the 'subjects' of the prior and the current representations are linked in some rational manner." 111 Cal. App. 4th at 711 (quoting *Flatt*, 9 Cal. 4th at 283). "Subjects" is not limited to "the discrete legal and factual issues involved in the compared representations." *Id.* at 712. Rather, the "subjects" include "information material to the evaluation, prosecution, settlement or accomplishment of the litigation or transaction given its specific legal and factual issues." *Id.* at 712-713. The broad scope of "subjects" is aimed to address the concern:

> that limiting the comparison of the two representations to their precise legal and factual issues might operate unrealistically to the detriment of the first client. Depending upon the nature of the attorney's relationship with the former client, in the office or in the courtroom, the attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand but which the attorney comes to know in providing the representation to the former client with respect to the previous lawsuit or transaction. For example, whether a lawsuit is settled or contested may depend upon a myriad of considerations about the client's affairs which might not be subject to discovery but which nonetheless determine the client's course of action, such as a decision to settle an action or a particular claim or issue because of the potential for unrelated adverse ramifications to the client were the case to go to trial. The same might be true about the client's internal operations or policies, such as one which favors the settlement of lawsuits filed in some locales but not others based upon the client's history or perceptions about the inclinations of juries (or the capabilities of the bench) in the particular venues.

*Id.* at 712.

Applying this broad definition to the facts of this case, there is clearly a "substantial relationship" between SAM's prior representation of Empire and SAM's current representation of Defendants. In its prior representation of Empire, SAM responded to demand letters from Empire's clients, and those kinds and numbers of complaints from

Empire's customers are part of what prompted Mr. Cohen to pursue this litigation against Defendants.  (Cohen Decl. ¶¶9-10.)  SAM also assisted Empire in the Crestos' attempt to sell Empire to a third party, including preparing a Membership Interest Purchase Agreement for that transaction, portions of which are included in the MIPA governing Plaintiffs' purchase of Empire.  After the Crestos sold Empire to Plaintiffs, SAM continued to represent Empire on the matters set out in the Open Matters Memo, which, again, form part of the basis for Plaintiffs' current claims against Defendants.  On these facts alone, there is a rational link between the subjects of SAM's prior representation of Empire and its current representation of Defendants.

This overlap between the factual and legal issues, however, is not the only factor that leads to a finding of a "substantial relationship" in this case.  Given that SAM represented Empire while it was owned first by the Crestos and then by Plaintiffs, SAM gained insight into not just the affairs of Empire, but also insight into its two owners, who are now on opposite sides of this litigation.  For instance, while Empire was owned by the Crestos, SAM gained insight into their approach to running Empire, including their decision-making process in responding to customer complaints and why some complaints were resolved and others were not.  (*See* Rozansky Decl., Ex. F at 35) (email from Ms. O'Malley to Mr. Cohen explaining Empire's "strategy and practice of responding to demand letters").  After Plaintiffs purchased Empire from the Crestos, SAM continued to work on Empire's "Open Matters," but now on behalf of Plaintiffs, giving SAM insight into Plaintiffs' state of mind, including their decision to file the present case.  (*See* O'Malley Decl. ¶12) (stating Mr. Cohen shared with Ms. O'Malley his concerns "that John and Roman had committed fraud in connection with the sale of Empire to LCC, and that he was speaking with an attorney and considering pursuing legal action against the Crestos.")  These circumstances also support a finding of a "substantial relationship" in this case. *See H.F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d 1445, 1455 (1991) (quoting *Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.*, 518 F.2d 751, 760 (2d Cir. 1975) (Adams, J., conc.)) (stating courts should consider "the attorney's possible

exposure to formulation of policy or strategy" in determining whether the "substantial relationship" test is met).  Indeed, the *Knight* court stated that "[w]here an attorney acquires knowledge about the former client's 'attitude,' practices, business customs, 'litigation philosophy,' strengths, weaknesses or strategy, disqualification may be required for that reason alone."  149 Cal. App. 4th at 1214 (quoting *Jessen*, 111 Cal. App. 4th at 712).

Defendants attempt to avoid this result, but none of their arguments are persuasive. First, Defendants argue there is no "substantial relationship" between SAM's prior representation of Empire and its current representation of the Crestos because SAM did not have any confidential information concerning Empire's "'open liabilities and financial situation[.]'"  (Opp'n to Mot. at 18.)  However, this argument ignores the presumption that applies in light of SAM's direct relationship with Empire, and the proscription against "delving into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not receive confidential information during the course of that relationship."  *Jessen*, 111 Cal. App. 4th at 709.  *See also H.F. Ahmanson*, 229 Cal. App. 3d at 1453 (citing Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv. L. Rev. 1244, 1319 (1981)) ("The conclusive presumption also avoids the ironic result of disclosing the former client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge and it makes clear the legal profession's intent to preserve the public's trust over its own self-interest.")[8]

Second, Defendants contend there was no "substantial relationship" because SAM's prior representation of Empire "concerned sending and responding to demand letters, …

---

[8] It also bears mention that Defendants do not dispute SAM received some confidential information from Empire related to "what was set forth in the Open Matters Memo." (Opp'n to Mot. at 18.)  Therefore, even if the "substantial relationship" test were dependent on the attorney's receipt of confidential information from the client, which it is not, *see Knight*, 149 Cal. App. 4th at 1214 (quoting *Jessen*, 111 Cal. App. 4th at 706) ("The 'aggrieved client' need only satisfy a 'low threshold of proof' and does not have to prove the attorney actually received confidential information."), that test would be met here.

22cv1944 DMS(BGS)

as well as some transactional work in revising documents (that are not at issue or relevant to this dispute and a prior potential sale (which is also not at issue or relevant to this dispute)[,]" whereas "the present matter concerns claims of fraud and breach of contract arising out of the MIPA which, again, SAM had no involvement in." (Opp'n to Mot. at 19.) Setting aside whether all of these representations are accurate, the argument, as a whole, relies on a narrow interpretation of "substantial relationship," which the courts have rejected. *See United States v. Sun Keung Lee*, No. CR 10-0186 MHP, 2011 WL 52599, at *1 (N.D. Cal. Jan. 6, 2011) (citing *Knight*, 149 Cal. App. 4th at 1213) (stating "substantial relationship test is broad and not limited to the strict facts, claims, and issues involved in a particular action."); *Herbalife Int'l of Am. v. Ford*, No. CV 07-2529 GAF (FMOx), 2007 WL 9757622, at *8 (C.D. Cal. Sep. 25, 2007) (same).

Next, Defendants argue against a finding of "substantial relationship" because to the extent SAM received any confidential information from Empire, that information has since been disclosed publicly and is therefore no longer confidential. (Opp'n to Mot. at 19.) As with Defendants' first argument, the Court rejects this argument as well because it relies on a false premise, namely that the "substantial relationship" test depends on a showing that the attorney received confidential information from their client.

Defendants' next argument is that there is no risk SAM will breach any duty of confidentiality to Empire because the only confidential information SAM received came from the Crestos. In other words, to the extent SAM has any confidential information about Empire, that information would also be in the possession of the Crestos, and thus, there is no way SAM could breach its duty of confidentiality to Empire. Like certain of Defendants' other arguments, this argument also relies on a false premise, the premise here being that SAM did not receive any confidential information from Plaintiffs after they purchased Empire. As discussed above, the direct relationship between SAM and Empire gives rise to a presumption that Empire disclosed confidential information to SAM. That presumption applies over the entirety of SAM's representation of Empire, not just while the Crestos owned Empire. The parties' dispute over whether Plaintiffs disclosed any

13

confidential information to SAM after they purchased Empire does not overcome that presumption. Indeed, Defendants' argument is just another attempt to persuade the Court to delve into the specifics of SAM's communications with Empire, which puts Empire's confidences "in danger of disclosure, however inadvertent." *Jessen*, 111 Cal. App. 4th at 710.

Defendants' arguments here and above are similar to the arguments made by the attorney facing disqualification in *Knight*. There, the attorney (Wideman) argued that because his discussions with the former client (Knight) were not confidential, his representation of the current clients (the Fergusons) could not prejudice Knight. 149 Cal. App. 4th at 1214. But the court was not persuaded. It stated:

> Wideman sells himself short. He is a lawyer with wide litigation experience. He was aware of Knight's business concerns and aspirations. Her ability to work with a partner is a possible issue in this case. In their cross-complaint the Fergusons allege that Knight did not recognize that her business relationship with them was corporate and not her sole proprietorship. However good his intention, he cannot help but use his expertise to exploit those concerns.

*Knight*, 149 Cal. App. 4th at 1214-15. That reasoning applies equally to Defendants' arguments here, which the Court rejects.

Defendants raise one more argument not directly related to the "substantial relationship" inquiry, which is that Plaintiffs have failed to show Defendants' interests are "materially adverse" to Empire's interests. (Opp'n to Mot. at 22) (quoting California Rule of Professional Conduct 1.9(a)). In support of this argument, Defendants rely on Empire's status as a non-party to this case, and Plaintiffs' apparent decision to shut down Empire's operations. This argument has some superficial appeal because Empire was, indeed, SAM's client, but it ignores that Empire is an LLC, and as such, it can only act through its members. *See Reliant Life Shares, LLC v. Cooper*, 90 Cal. App. 5th 14, 31 (2023) (stating "LLC acts through its members.") When Empire first engaged SAM, Empire was owned by Stryder, which was wholly owned by the Crestos. To the extent someone had to speak on behalf of Empire at that time, the ultimate decisionmakers and SAM's points of contact

for Empire would have been one or both of the Crestos.  After the Crestos sold Empire to LCC, the ultimate decisionmaker and SAM's point of contact for Empire was Mr. Cohen. Thus, although SAM's client was Empire, the owners and operators of Empire were different during the course of SAM's representation.  As counsel for Empire, SAM stood in a unique position as a bridge between the former and current owners of Empire, and gained access and insight into both owners' "'attitude[s],' practices, business customs, 'litigation philosoph[ies],' strengths, weaknesses [and] strateg[ies.]" *Knight*, 149 Cal. App. 4th at 1214 (quoting *Jessen*, 111 Cal. App. 4th at 712).  Although Defendants attempt to downplay Mr. Cohen's relationship with SAM, he became the decisionmaker for Empire after purchasing the company from the Crestos, and as the new owner, Defendants' interests in this case are materially adverse to Empire's.

In light of the discussion above, the Court finds there is a "substantial relationship" between SAM's prior representation of Empire and its current representation of Defendants.  Accordingly, SAM must be disqualified from this case.  *See Flatt*, 9 Cal. 4th at 283 ("Where the requisite substantial relationship between the subject of the prior and current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm.")[9]

---

[9] In light of this decision, the Court does not address whether SAM must be disqualified because its lawyers are allegedly material witnesses in this case. (*See* Mot. at 15-16; Opp'n to Mot. at 23-24.)   And although "'a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion[,]'" *Jarvis v. Jarvis*, 33 Cal. App. 5th 113, 140–41 (2019) (quoting *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal.4th 1135, 1144-45 (1999), the Court is not convinced that any of these factors are sufficient to avoid SAM's disqualification in this case.

22cv1944 DMS(BGS)

### III.

### CONCLUSION

For the reasons set out above, Plaintiffs' motion to disqualify SAM from this case is granted.  SAM shall not represent or assist Defendants with this lawsuit and shall not consult or share work product with new counsel.  Defendants shall promptly locate new counsel and file the appropriate substitution of counsel form.

**IT IS SO ORDERED**.

Dated:  August 24, 2023

Hon. Dana M. Sabraw, Chief Judge
United States District Court

22cv1944 DMS(BGS)